## No. 17,794.

HELEN LOUISE FOOSE, ET AL. *v.* H. E. HAYMOND.

(310 P. [2d] 722)

Decided April 22, 1957.    Rehearing denied May 20, 1957.

Mr. MAX D. MELVILLE, Mr. FRED WINNER, Mr. WILLIAM G. BERGE, for plaintiffs in error.

Mr. PAUL M. CLARK, Mr. LAWRENCE M. WOOD, Mr. ROBERT G. SMITH, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

THE parties appear here in the same order they appeared in the court below, where a motion for a directed verdict was granted and judgment entered dismissing plaintiffs' complaint. To review this judgment plaintiffs are here on writ of error. We shall refer to the parties as they appeared in the trial court, or by name.

Plaintiffs are husband and wife. Defendant is a physician and surgeon practicing his profession in Greeley, Colorado. On March 27, 1953, plaintiff, Helen Louise Foose, fell from a chair in her home and suffered an injury to her left foot. She consulted Dr. Haymond on the date of the accident, and again some two weeks later when she went to him for her periodic checkup, she then being some eight months along in pregnancy. She was delivered on April 20, 1953, defendant being the attending physician. Her complaint alleged that on these three occasions she called defendant's attention to the fact that she was suffering severe pain in her left heel; alleged that defendant was negligent in his care and treatment of her foot in that at no time did he have an x-ray picture taken of said foot or heel and that he "at no time prescribed proper care or treatment of plaintiff's said injury." In a second claim, the husband, Rhiney H. Foose, made similar allegations and demanded judgment for medical and hospital expenses incurred, together with damages for loss of consortium occasioned by the disability of his wife.

In his answer defendant admitted that he was the attending physician of plaintiff Helen Louise Foose on March 27, 1953, and in connection with her pregnancy.

He put in issue the other allegations of plaintiffs' complaint.

Trial was to a jury. At the conclusion of plaintiffs' evidence counsel for defendant moved for a directed verdict in favor of Dr. Haymond, which motion was not then ruled on by the court, ruling being reserved until the conclusion of all the evidence. When all the testimony was in, the court directed a verdict for defendant and the plaintiffs' complaint was dismissed.

The trial judge gave no reason for granting defendant's motion for a directed verdict. We surmise that he was misled in so doing because from the entire record the jury might conclude that the full measure of damages claimed by plaintiffs could not be recovered; there being some evidence in the case that a subsequent operation performed by Dr. Jacobs might have been necessary even if the fracture had been discovered when Dr. Haymond first examined the injured foot.

Counsel for plaintiffs contend that the evidence submitted was sufficient to require submission to the jury of the question of whether Dr. Haymond was negligent in not advising an x-ray, and in not properly diagnosing the condition of the foot or heel, and, as they claim, failing "to counsel Mrs. Foose not to walk upon her injured foot for some period of time." That had the injured member been immobilized the operation subsequently performed by another physician and surgeon would have been unnecessary. That failure to advise Mrs. Foose not to walk on the injured foot increased the "severity of the fracture" and made "it impossible for it to heal naturally."

Counsel further contend that there was a direct conflict in the evidence as to whether there was negligence on the part of defendant, and that there was ample evidence brought forward to create issues of fact to be decided exclusively by the jury.

It appears from the evidence that when Dr. Haymond first saw Mrs. Foose's injured foot he diagnosed the in-

jury as a sprain. Mrs. Foose testified that she told Dr. Haymond that when she fell from the chair she landed on her left heel. This was corroborated by her husband who was present when she claims to have so advised the doctor.

Mrs. Foose was injured on Friday. Following her fall she was found in a prostrate position unable to rise, and was literally carried to defendant's office by her husband. Both plaintiffs testified that she was carried into the defendant's office. Defendant denied this and said she hobbled in on the arm of her husband. Plaintiffs also testified, as did the neighbor who first found Mrs. Foose after the accident, that her foot was visibly displaced. After her visit to defendant's office she was taken home, remained in bed until the following Sunday when her husband procured a pair of crutches which she used thereafter in her efforts to get around until the time of her confinement. About a week following her return from the hospital, Mrs. Foose commenced bearing weight on her injured foot. She decided not to visit defendant again, and around May 14th visited another Greeley physician, Dr. Arford, who, after examination, advised an operation on the injured foot. He also suggested that she not use the foot.

Dr. Arford testified that if "the patient informs one that she had landed directly upon the heel, falling with the direct force coming upon the heel itself, I think one should at least suspect a fracture of the os calcis. However, I believe again it would depend an awful lot upon the examination and the history given, and the judgment of the physician." He further testified: "I would say, upon further examination, if there was any question at all in the mind of the physician, and particularly of [if] the swelling and discoloration was still quite pronounced at this time [28 days after the accident when Mrs. Foose was delivered] that x-ray would be advisable."

We quote from the testimony of Dr. Arford:

"Q. Doctor, if you had seen the patient immediately after she sustained the fall, and if you did not operate at that very time, how would you have treated the fracture at that time? A. Assuming a fracture had been diagnosed at that time, I would have treated it by immobilization — at least as a temporary measure until pregnancy had terminated. Q. What do you mean by immobilization, Doctor? A. The use of a cast. Q. Does this type of fracture ever heal from the cast alone? A. They do. Q. In your opinion Doctor, could this fracture have healed without the necessity of surgery, if a cast had been applied immediately after the fracture was sustained? A. I am sure the fracture itself, could have healed, Yes. Q. All right — counsel asked you if you gave Mrs. Foose any instructions at the time you examined her foot, and I believe, as counsel says, you stated No. Could you tell us why you did not give her any particular instructions at that time? A. I did not feel that any further changes would occur, if she were to continue to use the foot over a period of another week or so. I did not feel any further changes would then occur. What changes had taken place, were then present, and I felt they were permanent there."

The defendant testified that "if the patient had told me she landed on her heel, I would suspect a fracture, but she did not tell me that." He further said that if he had suspected a fracture, "I certainly would advise an X-ray at once." No x-ray was taken.

For the purpose of determining the validity of a motion for a directed verdict in favor of defendant, the evidence must be considered in the light most favorable to the plaintiff. Hence we must assume that Mrs. Foose did tell the defendant that in falling she landed on her heel and that a displacement thereof was visible upon the occasion of her first visit to him. The testimony of the defendant as to the applicable standards of diagnosis and treatment in cases of this kind might lead the jury to conclude that the defendant was negligent

in not having an x-ray taken; in not putting the foot in a cast, and in not instructing Mrs. Foose to bear no weight on the foot.

There is also competent evidence that a displacement such as plaintiffs claimed was evident, is a danger signal indicative of a fracture. This is admitted by the defendant. Dr. Arford, who performed the operation on Mrs. Foose's heel, testified that when he first saw her on May 14, 1953, "she presented a little deformity of the heel." Dr. John Jacobs, who examined the foot on May 15, 1953, testified that he found "the os calcis was badly fragmented and pushed down and back" and that "by the weight being put on it, this [the foot] had become twice as broad as normal."

The foregoing presents an issue of fact as to whether Mrs. Foose's heel was visibly displaced when she was first taken to defendant for examination and treatment. This disputed fact, together with the evidence of Mrs. Foose and her witnesses that she suffered extreme pain presented an issue of fact for the jury.

There is competent evidence from which the jury could have found that the use of Mrs. Foose's foot in walking, no advice being given her not to do so, aggravated the comminution of the fracture and increased the probability of a permanent injury. There is also competent evidence in the record that the damage might have been minimized had it been promptly discovered "by putting the fracture together and keeping it in that position."

Dr. John T. Jacobs, a witness for the plaintiffs, testified that when he first examined Mrs. Foose's foot he could not produce a complete motion of the ankle by manipulation and no motion from side to side. This, he said, "would indicate there was some disturbance in that joint, which had become set and hardened." He further testified:

"Q. What did you do thereafter, Doctor? A. I completed that examination and took X-rays of the foot and

ankle, and re-applied the elastic bandage, which I believe Dr. Arford had placed on, or had given her. Q. What did the X-rays show, Sir? A. The X-rays showed a severely fragmented, or communited *facture* [fracture] of the mallelous formations of the os calcis."

When asked to mark on the blackboard the location of the fracture the witness said he could not do it very well, and asked leave to state his findings, which he did as follows:

"A. The os calcis having been fractured in the fall, and the weight of the body having been thrown on it, the astragalus here had been fractured, and the joint had been pushed together. There were fragment lines all along here, and I found a great deal more fragmentation than is indicated by this wavy line. The os-calcis was forced from the front to the back in this region, and here are the processes which were communited and by the weight being put on it, this had become about twice as broad as usual. Q. Using my foot for example (indicating) it would make it come out this way, to the side? A. That's right. Q. And that was apparent from the physical examination of the foot was it, that it has been broadened out? A. Yes. Q. Now what did you find in the foot of Mrs. Foose? A. Exactly what I have described a moment ago. The os calcis was badly fragmented and pushed down and back, and that had become hardened and almost permanent and of course completely limited the motion of the joint, as well as causing considerable pain. Q. Did you find any gristle or fiberous material in that joint, Doctor? A. Yes. Q. Where did you find that? A. Where the joint formerly had been. When I operated it, you would hardly recognize it as a joint of course. Q. Is that gristle and fiberous material normal in sub-astraga*lois* joint, Doctor? A. Not the way I found it. No. Of course not. It was masses of cartilage and fiberous material that had moved in there from the fracture. Q. That is what I was trying to bring out Doctor, and I didn't quite know how to ask it. In other words,

that gristle and fiberous matter accrued in there between the time of the original injury and the time of the operation? A. Yes. * * * Q. Now Doctor under the same assumptions, if a reasonably competent physician and surgeon practicing in Greeley, Colorado, examined that same foot approximately two weeks later, and if the woman at that time complains of continued and constant pain, and the swelling and discoloration and appearances of the foot remain the same should said reasonably competent physician and surgeon at that time, suspect a fracture of the os calcis? A. No, I think he should suspect something else, but not necessarily a fracture of the os calcis. Q. Should he X-ray the foot? A. It is still an individual problem. I would. That is my opinion that probably it should be X-rayed. Q. The assumptions Dr. Jacobs are, that at that time on April 21st or April 27th, following the injury of March 27th, that there was swelling and discoloration in the ankle of the patient; that there was inversion or eversion of the foot; that there was pain in the heel, or in the foot, with the same particulars as given previously, that the patient had fallen from an ordinary height chair, landing on the foot — now under those circumstances and with all those assumptions, then would the decision of the attending physician necessarily be inconsistent with good practice among physicians and surgeons generally in Greeley, when he decided not to take an X-ray photograph? A. It might be. It is still a matter of individual decision and judgment. Q. And might it not be inconsistent? A. It might be either way. It is a matter of individual decision. Q. And isn't it true that a usually competent physician and surgeon practicing in Greeley, Colorado, would not be guilty of carelessness in failing to make an X-ray under those circumstances, if the history showed a fall from a straight chair and the visual examination shows the factors that have been mentioned in the hypothetical questions asked by Mr. Winner — that is the swelling and pain and discoloration and eversion — isn't it true

that those assumptions being accepted, that the attending physician would not be required, by good practice in Greeley, to take an X-ray photograph? A. Not necessarily. My answer to that question is the same as it was before. It is still an individual problem that he will have to solve and determine and make his own individual decision. I could not answer that question unless I saw the individual problem at the exact time."

██ A physician is bound to accord his patients such reasonable care, skill and diligence as physicians in good standing in the same neighborhood in the same general line of practice ordinarily have and exercise in like cases. A physician who negligently diagnoses as a bruise or sprain, what is in fact a fracture, may be liable in damages to his patient. *Bonnet v. Foote,* 47 Colo. 282, 107 Pac. 252.

██ To avail himself of the defense of a mistake of judgment, it must appear that the physician used reasonable care in exercising that judgment, which in the instant case was a controverted issue of fact to be determined by the jury. In *Bonnet v. Foote, supra,* it was said: "The claim of plaintiff, and as the evidence establishes, was that the defendant did not treat her for a fractured bone, but for a severe bruise, and that he improperly diagnosed her injury. The bone was fractured. From the evidence it appears that defendant should have discovered this fact." There a judgment against the physician was affirmed, the court stating: " * * * the question to determine is whether or not it appears that defendant was guilty of negligence in diagnosing and treating her injury."

We are convinced that there was sufficient evidence in the record upon which the case should have been submitted to the jury under proper instructions.

The judgment is reversed and the cause remanded with directions to grant a new trial.

Mr. Justice Frantz not participating.