**Thomas Pierce LININGER, a minor, By and Through his parents and next friends, Richard LININGER and Pamela Lininger, and Richard Lininger and Pamela Lininger, individually, Petitioners,**

v.

**Allan M. EISENBAUM, M.D., W. Bruce Wilson, M.D., Gerald E. Meltzer, M.D., and Gerald E. Meltzer, M.D., P.C., Respondents.**

No. 86SC307.

Supreme Court of Colorado, En Banc.

Nov. 28, 1988.

Neil A. Hillyard, M. Susan Kudla, Branney, Hillyard, Kudla and Lee, Englewood, for petitioners.

Peter W. Pryor, Ingrid E. Slezak, Pryor, Carney & Johnson, Englewood, for respondents.

Gerald P. McDermott, Gene M. Hoffman, Hoffman & Boyd, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Susan Smith Fisher, Breit, Best, Richman and Bosch, P.C., Denver, for amicus curiae Colorado Defense Lawyers Ass'n.

ROVIRA, Justice.

Plaintiffs Richard and Pamela Lininger and their son, Pierce, seek review of the district court's dismissal of their medical malpractice claims against the defendants-physicians. We granted the Liningers' petition for a writ of certiorari pursuant to C.A.R. 50 on the following issues: (1) Does the complaint filed by an infant's parents, alleging negligent conduct by physicians resulting in wrongful birth, state a claim upon which relief may be granted? and (2) Does the complaint filed on behalf of an infant, alleging negligent conduct by physicians resulting in wrongful life, state a claim upon which relief may be granted?

We answer the first question in the affirmative, the second in the negative, and accordingly affirm in part and reverse in part the district court's order of dismissal.

## I.

Because we are assessing the legal sufficiency of the Liningers' complaint, we accept the following factual allegations as true. On October 14, 1981, Stephen Skyler Lininger (Stephen) was born to Pamela and Richard Lininger (Liningers). Dr. Caplan, Stephen's pediatrician, examined him in March 1982, and detected problems with Stephen's vision. Stephen was later examined by Dr. Eisenbaum, a pediatric ophthalmologist, Dr. Wilson, a neuro-ophthalmologist, and Dr. Meltzer, an ophthalmologist. Each physician opined that Stephen had a congenital optic nerve hypoplasia.

The Liningers were concerned that Stephen's blindness might have arisen from a genetic defect. Although they thought a fully sighted child would be beneficial in assisting Stephen's development, they were unwilling to have another blind child. To better inform their decision, the Liningers sought their physicians' advice about the possibility that a second child would be born blind.

The defendants-physicians informed the Liningers that, in their opinion, Stephen's

affliction was non-hereditary. In reliance on that advice, the Liningers chose to conceive a second child, and on August 26, 1983, Thomas Pierce Lininger (Pierce) was born. A few months later, it was discovered that he, too, was blind. Both children were subsequently diagnosed as being afflicted with Leber's congenital amaurosis, an hereditary form of blindness. Given that Stephen was born with Leber's, the risk that Pierce would suffer a similar disability was one in four.

The Liningers allege that the defendants were negligent in failing to diagnose properly Stephen's condition as Leber's congenital amaurosis when they first examined him, in communicating the misdiagnosis to the Liningers, and finally, in advising them that Stephen's affliction was not hereditary. But for those acts of negligence, the complaint further alleges, the Liningers would "have avoided conception or terminated the pregnancy...." Pierce claims that as a result of the defendants' negligence, he has suffered a loss of enjoyment of a natural life, has endured pain and suffering, and will suffer in the future. Both the Liningers and Pierce seek general damages for emotional distress and pain and suffering, and special damages for doctors, nurses, hospitals, and special education.

On defendants' motion for summary judgment, the district court found that neither the Liningers nor Pierce stated cognizable claims for relief against defendants under Colorado law, and dismissed the complaint in its entirety.[1]

## II.

■ The complaint attempts to state a "wrongful birth" claim on behalf of the Liningers and a "wrongful life" claim on behalf of Pierce.[2] "Wrongful birth" is the term used to describe a medical malpractice claim brought by the parents of a child born with an impairment or a birth defect. In this case, the malpractice claim is based on an allegedly negligent diagnosis which resulted in the failure to properly inform the parents of potential risks to a second child. The parents allege that but for a physician's negligence in either misinforming them or failing to inform them about the likelihood that their child would be born with a birth defect or impairment, they would not have conceived or would not have carried to term the child who was subsequently born with an impairment. "Wrongful life," on the other hand, denominates a medical malpractice claim in which the child alleges that but for a physician's negligence, as described above, he would not have been born to suffer the impairment.[3]

**1.** Defendants Eisenbaum, Wilson, and Meltzer moved for summary judgment against Pierce with respect to all his claims, and for partial summary judgment against Richard and Pamela with respect to their claim for emotional distress, on the basis that the complaint failed to state claims upon which relief could be granted. Defendant Caplan moved separately for summary judgment against the plaintiffs on the basis that there was no genuine issue of material fact and that, as a matter of law, his actions were not negligent. The trial court did not rule on Caplan's motion.

After reviewing the parties' briefs, the evidence submitted therewith, and the relevant law, the court concluded:

This case is scheduled for a two-week trial. It will be enormously expensive to try in terms of money as well as time. It is common sense not to expend the time and money when it is unknown whether the claims alleged actually exist. Accordingly, the motions of defendants for summary judgment are granted. This case is dismissed with prejudice.

It is clear from the court's order that the court dismissed the complaint for failure to state claims upon which relief could be granted, and we so treat that order.

**2.** The use of the terms "wrongful life" and "wrongful birth" more often serves to obscure the issues than to elucidate them; unfortunately the labels are so entrenched in normal usage that it is difficult to entirely abstain from their use.

**3.** A third cause of action, wrongful pregnancy, is brought by the parents of a healthy child alleging that but for the defendant's failure to perform a sterilization procedure or an abortion properly, the child never would have been born. *E.g., Johnston v. Elkins,* 241 Kan. 407, 736 P.2d 935 (1987); *Morris v. Sanchez,* 746 P.2d 184 (Okla.1987). A wrongful pregnancy action is not presented by this case, and we express no opinion on the subject.

Although courts and commentators often speak of wrongful life and wrongful birth as torts in themselves, it is more accurate to view these terms as describing the result of a physician's negligence. The asserted negligence may involve any number of distinguishable negligent acts including, but not limited to, the misdiagnosis of an hereditary condition, the misrepresentation of the risks associated with conception and delivery of a child, the negligent interpretation of diagnostic tests, or the negligent performance of a sterilization procedure.[4]

The questions before us are whether the Liningers' complaint sufficiently alleges facts which, if proven, entitle them to relief, and similarly, whether Pierce's allegations state a claim upon which he could be granted relief. We address the purported claims in turn.

### A.

To state a claim sounding in tort upon which relief may be granted, a complaint must identify (1) a legal duty the defendant owes to the plaintiff, (2) the defendant's breach of that duty, and (3) an injury to the plaintiff that is (4) proximately caused by the defendant's breach. W. Prosser & W. Keeton, *The Law of Torts* 164–65 (5th ed. 1984).

The Liningers first assert that each defendant had a duty to disclose the nature of Stephen's impairment, and further, each defendant had a duty to inform them of the enhanced likelihood that a second child would be similarly afflicted. They then allege that defendants negligently failed to accurately diagnose Stephen's condition, and thus negligently failed to inform them of the increased risk to a second child.

In *Bloskas v. Murray*, 646 P.2d 907 (Colo.1982), we recognized that a cause of action for negligent misrepresentation will lie against a physician who, during the course of the physician-patient relationship, "negligently conveys false information to the patient, and the patient relies upon the information" to his detriment. 646 P.2d at 915. Moreover, we have recognized that a physician owes to his patients the duty to act within reasonable standards of medical care in diagnosing the patient's medical condition. *See Comstock v. Collier*, 737 P.2d 845, 848 (Colo.1987); *Foose v. Haymond*, 135 Colo. 275, 283, 310 P.2d 722, 726 (1957). Defendants do not contend, nor do we see any reason to find, that those duties did not arise in their diagnosis of Stephen and provision of medical advice to the Liningers.[5]

The complaint sufficiently alleges, therefore, that defendants breached some duty owed to the Liningers. The complaint also adequately alleges, and again defendants do not disagree, that the defendants' purported negligence proximately caused the birth of Pierce since the Liningers would not have conceived a second child (or would have terminated the pregnancy) had they accurately been apprised of the possibility that a second child would suffer the same affliction.[6]

Finally, the Liningers assert that they were damaged in the following respects:

---

4. *See, e.g., Gallagher v. Duke University*, 852 F.2d 773 (4th Cir.1988) (North Carolina law) (negligent interpretation of amniocentesis results); *Turpin v. Sortini*, 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982) (negligent failure to diagnose previous child's hereditary deafness); *Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984) (negligent failure to diagnose rubella in mother following conception); *Pitre v. Opelousas General Hosp.*, 517 So.2d 1019 (La. App.), *writ granted*, 519 So.2d 105 (La.1987) (negligent performance of tubal ligation); *Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978) (negligent misrepresentation of possibility that kidney disease could be passed to offspring); *Harbeson v. Parke-Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983) (negligent failure to warn mother of range of effects

of Dilantin on future children; suggesting failure to secure informed consent of patient).

5. The *amicus* brief of the Colorado Defense Lawyers Association forthrightly acknowledges that a "physician in a case such as this clearly has a duty to inform the parents of a diagnosable potential that a future child may have a hereditary impairment."

6. Only one court has determined that the element of causation cannot be proven in a wrongful birth case. The Missouri Supreme Court decided that neither wrongful life claims nor wrongful birth claims are cognizable under the common law of Missouri, and explained:

> The heart of the problem in these cases is that the physician cannot be said to have caused the defect. The disorder is genetic and not

Plaintiffs Richard and Pamela Lininger have incurred expenses on behalf of Thomas Pierce Lininger for doctors, nurses, hospitals, medicines, therapists, special schools, special education and special equipment and will in the future incur [similar expenses]. Plaintiffs Richard and Pamela have in the past suffered a loss of time and earnings and will in the future suffer a loss of time and earnings, all to their damage ... [and] have in the past experienced emotional distress, embarrassment, humiliation and anxiety and will in the future experience emotional distress, embarrassment, humiliation and anxiety.

■ Although defendants did not assert before the trial court that the Liningers failed to plead a cognizable injury resulting from their asserted negligence, they now urge that we follow the Supreme Court of North Carolina in declaring that:

In order to allow recovery [for wrongful birth] courts must ... take a step into *entirely untraditional analysis* by holding that the existence of a human life can constitute an injury cognizable at law. Far from being "traditional" tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury.

*Azzolino v. Dingfelder*, 315 N.C. 103, 109–112, 337 S.E.2d 528, 533–34 (1985), *cert. denied*, 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986) (emphasis in original).

We disagree. The Liningers allege, at a minimum, that but for the defendants' negligence they would not be burdened by extraordinary medical and education expenses associated with the treatment of Pierce's blindness. That monetary burden is no different from medical or rehabilitation expenses associated with any personal injury, and, contrary to *Azzolino*'s suggestion, we need not find that "life, even life with severe defects," constitutes a legal injury in order to recognize the Liningers' claim for relief.

The defendants argue further that even if we recognize that the parents suffer an injury by being deprived of the opportunity to avoid bearing an impaired child, appropriate damages are not fairly ascertainable in light of the "benefit rule," under which any special benefit to the plaintiff resulting from the defendants' negligence must be offset against the damage the negligence causes to the extent necessary to achieve an equitable result. *See Restatement (Second) of Torts* § 920 (1977). Defendants contend, in essence, that because the benefits the Liningers derived from having a second child cannot be measured in any rational way against the injuries they claim to have suffered, we should decline to permit them to recover any damages.

Assuming, without deciding, that the benefit rule must be applied in measuring the damages the Liningers have suffered and will in the future suffer,[7] we are not persuaded that the application of that rule so undercuts any rational basis for awarding damages that relief must be denied

the result of any injury negligently inflicted by the doctor. In addition it is incurable and was incurable from the moment of conception. Thus the doctor's alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition.... The child's handicap is an inexorable result of conception and birth.
*Wilson v. Kuenzi*, 751 S.W.2d 741, 744–45 (Mo. 1988) (quoting *Becker v. Schwartz*, 46 N.Y.2d 401, 417, 386 N.E.2d 807, 815, 413 N.Y.S.2d 895, 904 (1978) (Wachtler, J., concurring in part and dissenting in part) (superseded by statute)).
We disagree, however, because we do not find that the injury to the parents is simply that their child is impaired. Rather, as discussed below, the parents are injured to the extent they

choose, based on the physicians' alleged misrepresentation, to conceive and deliver an impaired child therefore incurring extraordinary medical expenses. *Accord Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984) (overruled in part by statute).

7. We have found only two cases discussing the application of the benefit rule to wrongful birth claims. *See Gallagher v. Duke University*, 852 F.2d 773 (4th Cir.1988) (offset rule does not apply to offset parents' damages); *Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984) (overruled in part by statute) (offset rule applies only to parents' claims for emotional distress). The benefit rule is usually discussed with respect to a child's plea for relief on the basis of a wrongful life claim. *See, e.g., Strohmaier v. Associates in*

entirely. We think it clear that the extraordinary financial burden the Liningers claim to have suffered, and will continue to suffer, is sufficiently unrelated to the pleasure they will derive from raising Pierce as to preclude operation of the benefit rule, at least to the extent that it would require some offset against those particular damages.

We conclude, therefore, that the Liningers may prove and recover those extraordinary medical and education expenses occasioned by Pierce's blindness. We express no opinion as to whether other damages, such as general damages for emotional distress, may be recovered,[8] and, if so, whether the benefit rule would require an offset against such damages.

In addition to their contention that wrongful birth claims do not fit within tra-ditional tort analysis, defendants proffer several arguments to the end that we should decline to recognize a claim for wrongful birth for prudential reasons even if such a claim fits within the confines of established negligence principles.

First, defendants contend that the maintenance of wrongful birth suits could have a substantial negative impact on the family should the impaired child subsequently learn that he was at the center of such an action. We fail to see how the parents' recovery of extraordinary medical and educational expenses, so as to minimize the detrimental effect of the child's impairment, is outweighed by any speculation about stigma that he might suffer.

Second, defendants argue that the potential for fraudulent claims cautions against

---

*Obstetrics & Gynecology,* 122 Mich.App. 116, 332 N.W.2d 432 (1982); *Nelson v. Krusen,* 678 S.W. 2d 918 (Tex.1984).

**8.** We did not grant certiorari on the issue of what damages may be awarded in a wrongful birth case. In light of the necessity that we identify some injury for purposes of establishing the viability of the Liningers' cause of action, and because the parties' briefs discuss the damage issue, we have chosen to address the question of extraordinary medical and education expenses.

We also note that the question may arise as to whether defendants may be liable for medical and other extraordinary expenses after Pierce reaches the age of majority. Because the Liningers have been damaged to the extent that they are legally responsible for Pierce's medical and education expenses, the defendants' liability should, in principle, extend to Pierce's majority, or older, if Pierce remains a legal dependent of the Liningers.

It is impossible, solely on the basis of the allegations of the complaint, to determine when Pierce will be emancipated from his parents. We have held previously that, at least in the context of support payments following a dissolution of marriage, parents may be legally responsible for the support of an adult child: "when [the] child is obviously incapable of supporting himself by reason of some physical or mental disability, the presumption of emancipation is no longer valid, and the duty of parental support may continue under certain circumstances." *Koltay v. Koltay,* 667 P.2d 1374, 1376 (Colo.1983). Several other states have permitted the recovery of medical expenses until the impaired child is no longer dependent on his parents. *See Gallagher v. Duke University,* 852 F.2d 773 (4th Cir.1988) (North Carolina law); *Robak v. United States,* 658 F.2d 471 (7th Cir. 1981) (Alabama law); *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984) (based on statute); *James G. v. Caserta,* 332 S.E.2d 872 (W.Va.1985).

As a consequence, should the Liningers seek recovery of medical expenses beyond Pierce's age of majority, they must prove that he will be dependent on them beyond that age.

A second question that may arise in a wrongful birth case is whether the parents may recover all the costs of raising the impaired child, or only the medical and special expenses directly attributable to the impairment. Although most cases recognizing actions for wrongful birth have permitted the recovery of extraordinary medical expenses, only a few have discussed whether parents may recover, in addition, the normal costs associated with raising a child. *Compare Gallagher v. Duke University,* 852 F.2d 773 (4th Cir.1988) (North Carolina law); *Moores v. Lucas,* 405 So.2d 1022 (Fla.App.1981); *and Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 233 N.W.2d 372 (1975) (parents may not recover costs associated with raising healthy child), *with Robak v. United States,* 658 F.2d 471 (7th Cir. 1981) (Alabama law) *and Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982) (parents may recover all costs of raising child). One court has held that the parents may recover only those expenses "arising out of the pregnancy and delivery" of the impaired child, and not any expenses related to the care of the child after birth. *Pitre v. Opelousas General Hosp.,* 517 So.2d 1019, 1025 (La.App.), *writ granted,* 519 So.2d 105 (La.1987).

In this case, the Liningers do not request damages for the costs ordinarily associated with raising a healthy child, and we need not decide whether those costs may be recovered.

permitting parents to sue for wrongful birth. The defendants have not convinced us that wrongful birth claims are particularly susceptible to being asserted fraudulently, and even were we so persuaded, the possibility of fraud has not been shown to be so great as to justify extinguishing meritorious claims.

Finally, defendants argue generally that, in light of the public policy issues at stake, the legislature, and not this court, is the appropriate forum to "create" a cause of action not recognized at common law. As we have explained above, however, the complaint states a cause of action within the confines of common law negligence. We are not persuaded by defendants' public policy arguments, and in light of our finding that we are merely applying common law negligence principles and not "creating" a new cause of action unknown at common law, we see no reason to defer the resolution of this issue to the legislature.

As one court explained in rejecting a similar argument:

> Our holding that the plaintiffs have stated a cause of action [for wrongful birth] involves the application of the doctrine of negligence, established by the common law of the Commonwealth of Pennsylvania, to a recently developed medical procedure. The determination of the scope of the common law doctrine of negligence is within the province of the judiciary.

*Gildiner v. Thomas Jefferson University Hospital,* 451 F.Supp. 692, 696 (E.D.Pa. 1978).

In summary, the Liningers' complaint sufficiently states a cause of action upon which relief may be granted, and they are entitled to prove and to recover at least the extraordinary medical and education expenses they have incurred, and will incur, in raising Pierce, if they are able to establish that those expenses were proximately caused by defendants' negligence.[9]

---

**9.** In recognizing the parents' claim for relief, we align ourselves with the overwhelming majority of other jurisdictions which have recognized wrongful birth claims. *See Gallagher v. Duke University,* 852 F.2d 773 (4th Cir.1988) (North Carolina law); *Robak v. United States,* 658 F.2d 471 (7th Cir.1981) (Alabama law); *Haymon v. Wilkerson,* 535 A.2d 880 (D.C.App.1987); *Moores v. Lucas,* 405 So.2d 1022 (Fla.App.1981); *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984); *Siemieniec v. Lutheran General Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987); *Pitre v. Opelousas General Hosp.,* 517 So.2d 1019 (La.App.), *writ granted,* 519 So.2d 105 (La.1987); *Proffitt v. Bartolo,* 162 Mich.App. 35, 412 N.W.2d 232 (1987); *Smith v. Cote,* 128 N.H. 231, 513 A.2d 341 (1986); *Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834 (1981); *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984); *Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975); *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982); *Harbeson v. Parke–Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983); *James G. v. Caserta,* 332 S.E.2d 872 (W.Va.1985); *Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 233 N.W.2d 372 (1975).

The North Carolina and Missouri Supreme Courts have found that such actions are proscribed under common law negligence principles. *See Wilson v. Kuenzi,* 751 S.W.2d 741 (Mo.1988) (superseded by statute); *Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528 (1985), *cert. denied,* 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986).

In addition, the legislatures of at least six states have enacted laws concerning wrongful life, wrongful birth, or wrongful pregnancy. Idaho law prohibits claims for relief based on the negligent prevention of an abortion, but does not prohibit claims based on negligence resulting in conception. Idaho Code § 5–334 (Supp.1986). Maine proscribes recovery of damages in any case in which the alleged injury is the birth of a healthy child, and while not distinguishing between wrongful life and wrongful birth claims, limits damages where a child is born impaired to the costs associated with the impairment itself. Me.Rev.Stat.Ann. tit. 24, § 2931(3) (1987 Supp.). Minnesota proscribes both wrongful life and wrongful birth actions in those terms. Minn.Stat. § 145.424 (1986). Missouri's statute only expressly proscribes actions in which the asserted injury is the prevention of an abortion. Mo.Ann.Stat. § 188.130 (Vernon Supp.1988). Nonetheless, the possibility that a child or his parents could bring an action based on a mother's *conception* of a child as a result of a physician's negligence has been foreclosed by *Wilson v. Kuenzi,* 751 S.W.2d 741 (Mo.1988), in which the court held that neither wrongful life claims nor wrongful birth claims were cognizable under Missouri's law prior to adoption of the statute. South Dakota bars any claims based on the birth of a child, whether or not impaired, and whether arising from the deprivation of an opportunity to abort a fetus or from depriving the mother of the opportunity to avoid conception. S.D. Codified Laws Ann. § 21–55–2 (Rev.1987). Utah's law is similar to Missouri's in proscribing ac-

## B.

■ Just as we measured the viability of a claim for relief for wrongful birth against standard negligence principles, so we measure the purported claim for wrongful life on behalf of Pierce.

The underlying assumption of Pierce's claim for wrongful life is that a physician owes a duty to a child who might be born in the future, to ensure that the child's parents are apprised of the consequences of their conceiving or delivering a child so that they may exercise their right to plan their family accordingly. *But see James G. v. Caserta,* 332 S.E.2d 872, 881 (W.Va. 1985) (the "duty to inform does not extend to the unborn child as it is the parents' decision to risk conception or to terminate a pregnancy."). Because we need not pass on the validity of that assumption in this case, we accept it only for the sake of determining whether, even in light of this alleged duty, Pierce has stated a claim for relief. We also assume, *arguendo,* that the complaint adequately alleges that whatever injuries Pierce suffered were proximately caused by defendants' breach of that duty. *But see Wilson v. Kuenzi,* 751 S.W.2d 741 (Mo.1988) (rejecting wrongful life claim on basis that impaired child cannot prove causation).

We must consider, then, whether Pierce suffered a legally cognizable injury. But for the physicians' alleged negligence, Pierce would have neither been burdened by the disadvantages of his impairment nor would he have experienced the benefits of life. He simply would not have existed. The difference between the value of his impaired existence and the value of his non-existence, then, constitutes the injury (and the measure of damage) he suffered as a proximate result of the physicians' failure to provide accurate information to Pierce's parents. To hold that Pierce adequately pleaded that he suffered a legally cognizable injury would be to hold, therefore, that one might properly conclude that Pierce's existence constitutes a detriment

to him; that from his perspective, it would have been better had he not been born at all.

Pierce contends, however, that we need not determine that an impaired existence is better than no existence to find that he was injured. His injury is not, he claims, that he was born impaired rather than not having been born at all, but instead that his parents were deprived of their right to decide, on Pierce's behalf, whether it would be better that he not be conceived or, if conceived, not be carried to term. In so arguing, Pierce relies on Justice Handler's explanation of the purported injury in *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984):

> [The] injury consists of the consequences of the deprivation of his parents' right to determine on his behalf whether he should have been born. What then is at issue as the basis for a cause of action is *not* the postulate that nonlife is preferable to life, but only whether parents— for themselves and their child as a family—were deprived of the opportunity to make the fateful decision and enact their preference of one over the other.

97 N.J. at 364, 478 A.2d at 769 (Handler, J., concurring in part and dissenting in part) (emphasis in original).

We find no substantive difference between the injuries which Pierce attempts to distinguish. Even conceding that Pierce's parents were deprived of their right to make an informed decision regarding his conception, the sole consequence of that deprivation was that Pierce was born. Had Pierce's parents made an informed choice— the deprivation of which Pierce cites as his injury—he would not have been born because his parents claim that they would not have conceived him or would have aborted the fetus had they been adequately informed. Pierce's characterization of his injury does not change the nature of the detriment he claims to have suffered: namely, that he was born impaired instead of not being born.

tions in which the failure to abort a fetus constitutes the alleged injury. Utah Code Ann.

§ 78–11–24 (1987 Repl.).

We agree with the overwhelming majority of courts which have addressed the issue that a person's existence, however handicapped it may be, does not constitute a legally cognizable injury relative to non-existence.[10] Our finding of such an injury would require first, that we value Pierce's present station in life; second, that we ascertain the value to Pierce of his not having been born; and finally, that we determine that the latter value is greater than the former. Because we find it impossible to complete those steps in any rational, principled manner, we cannot find that Pierce has suffered an injury sufficient to support a claim for relief.

With respect to the first step, one must recognize not only that Pierce will experience pain and suffering during his life, but also that he will experience benefits as well. Even if we could say with confidence that a life free of handicaps is measurably better than a life encumbered by impairments, we know of no means by which to assess the value of life without resort to such a comparison. The circumstances of Pierce's birth do not fairly lend themselves to such a comparison; he never had the opportunity to have been born completely healthy.

Second, we cannot appraise the value of Pierce's nonexistence for purposes of comparing it with his impaired existence. The relevant question—of what value to Pierce would his non-existence have been?—is entirely too metaphysical to be understood within the confines of law, if indeed, the question has any meaning at all.

The difficulty that besets Pierce's complaint is not merely that damages are inherently too speculative to assess. While the discussion above compels that conclusion, the more fundamental problem is that we cannot determine in the first instance that Pierce has been injured. We conclude that for want of an allegation of a legally cognizable injury, Pierce's complaint fails

---

**10.** The following courts have disallowed wrongful life claims on the basis that the child suffered no injury or on the grounds that, assuming the child did suffer an injury, damages would be impossible to calculate. *Elliott v. Brown,* 361 So.2d 546 (Ala.1978); *Moores v. Lucas,* 405 So.2d 1022 (Fla.App.1981); *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984); *Siemieniec v. Lutheran General Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987); *Bruggeman v. Schimke,* 239 Kan. 245, 718 P.2d 635 (1986); *Pitre v. Opelousas General Hosp.,* 517 So.2d 1019 (La.App.), *writ granted,* 519 So.2d 105 (La.1987); *Strohmaier v. Associates in Obstetrics & Gynecology,* 122 Mich.App. 116, 332 N.W.2d 432 (1982); *Smith v. Cote,* 128 N.H. 231, 513 A.2d 341 (1986); *Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528 (1985), *cert. denied,* 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986); *Ellis v. Sherman,* 512 Pa. 14, 515 A.2d 1327 (1986); *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981); *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984); *Dumer v. St. Michael's Hosp.* 69 Wis.2d 766, 233 N.W.2d 372 (1975).

One court based its decision solely on the grounds that a physician owes no duty to an unborn child to ensure that he is born, *James G. v. Caserta,* 332 S.E.2d 872 (W.Va.1985); another found that even if the child was injured, his injury was not caused by a physician's negligence, *Wilson v. Kuenzi,* 751 S.W.2d 741 (Mo. 1988); and one court found that the state's public policy precluded the maintenance of wrongful life actions, notwithstanding its finding that neither the speculative nature of damages nor the difficulty of identifying the injury posed an insurmountable barrier to wrongful life claims. *Phillips v. United States,* 508 F.Supp. 537 (D.S.C. 1980) (South Carolina law). *Accord Smith v. Cote,* 128 N.H. 231, 513 A.2d 341 (1986) (alternative holding).

Courts have also cited as alternative reasons that the recognition of wrongful life claims is inconsistent with society's view of the sanctity of life, *see Siemieniec,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691; *Bruggeman,* 239 Kan. 245, 718 P.2d 635; or that no child has a right not to be born, *see Elliott,* 361 So.2d 546; *Moores,* 405 So.2d 1022; *Pitre,* 517 So.2d 1019.

California, New Jersey, and Washington courts have recognized a child's right to recover only special damages for wrongful life, as discussed in the text of the opinion. Maine limits damages in cases in which an impaired child is born to those damages associated with the impairment, but the statute does not distinguish between wrongful life and wrongful birth claims. Me.Rev.Stat.Ann. tit. 24, § 2931(3) (1987 Supp.).

Finally, we note that the Colorado Court of Appeals has held that a child has a claim for relief based on wrongful life. *Continental Casualty Co. v. Empire Casualty Co.,* 713 P.2d 384 (Colo.App.1985). To the extent that case is in conflict with the views expressed here, it is overruled. *See Empire Casualty Co. v. St. Paul Fire & Marine Ins. Co.,* 764 P.2d 1191 (Colo. 1988), in which we affirmed the court of appeals' decision in part and reversed in part.

to state a claim upon which relief can be granted.

Three states have recognized a child's cause of action for special damages arising from the deprivation of his parents' right to choose whether to conceive or bear the child, notwithstanding their apparent agreement that the child has suffered no cognizable injury.

In *Turpin v. Sortini*, 31 Cal.3d 220, 643 P.2d 954, 182 Cal.Rptr. 337 (1982), Joy Turpin alleged that but for the defendant-physician's failure to diagnose her sister's hereditary deafness, her parents would not have conceived her. Although the California Supreme Court concluded that it is "doubtful that a child's claim for general damages should properly be denied on the rationale that the value of impaired life, as a matter of law, always exceeds the value of nonlife," the court went on to find that:

> [W]ith respect to the child's claim for pain and suffering or other general damages—recovery should be denied because (1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner.

31 Cal.3d at 235, 643 P.2d at 963, 182 Cal.Rptr. at 346. In response to Turpin's assertion that the mere difficulty in assessing damages should not bar her action, the court emphasized that "the problem is not ... simply the fixing of damages for a conceded injury, but ... determining whether the plaintiff has in fact suffered an injury by being born with an ailment as opposed to not being born at all." 31 Cal.3d at 235, 643 P.2d at 963, 182 Cal. Rptr. at 346.

The court then considered Turpin's request for special damages. Instead of reiterating its conclusion that she suffered no ascertainable injury entitling her to maintain an action, the court concluded that an impaired child should be permitted to recover the "certain and readily measurable" extraordinary medical expenses associated with her impairment:

> [I]t would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care. If such a distinction were established, the afflicted child's receipt of necessary medical expenses might well depend on the wholly fortuitous circumstance of whether the parents are available to sue and recover such damages or whether the medical expenses are incurred at a time when the parents remain legally responsible for providing such care.

31 Cal.3d at 238, 643 P.2d at 965, 182 Cal.Rptr. at 348. The court was satisfied to ground its decision on what it perceived to be an equitable result, and chose not to explain why the absence of a cognizable injury was not fatal to Turpin's claim for special damages.

The New Jersey Supreme Court similarly disregarded the apparent lack of an injury to the child in *Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984). The court concluded that an impaired child should be permitted to maintain a claim for special damages notwithstanding its decision not to allow a similar claim for general damages:

> Law is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become an instrument of injustice. Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the injustice of that result.... We need not become preoccupied ... with these metaphysical considerations [concerning whether a defective life is better than no life at all]. Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction.

97 N.J. at 351–54, 478 A.2d at 762–63. We understand this language as holding that the traditional requirement that a plaintiff demonstrate injury to recover in tort is less important in wrongful life cases than ensuring that an impaired child recover the extraordinary medical expenses to which his impairment will give rise, to the extent that the child's parents are unable to recover.

In *Harbeson v. Parke–Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983), the Washington Supreme Court reached the same conclusion as that reached by the California and New Jersey Supreme Courts, but again without finding expressly that the plaintiff child had suffered an injury. Although the court endeavored to "consider wrongful life according to the four traditional tort concepts of duty, breach, injury, and proximate cause," 98 Wash.2d at 479, 656 P.2d at 495, upon reaching the question of injury the court chose merely to answer the assertions that special damages in wrongful life cases are too speculative and that "to recognize life itself as an actionable injury would be inimical to deeply held beliefs that life is more precious that non-life." 98 Wash.2d at 481, 656 P.2d at 496. After finding the first assertion to be without merit, the court summarily rejected the second, stating:

> Suffice it to say here that we do not agree that requiring a negligent party to provide the costs of health care of a congenitally deformed child does not appear to us to be a disavowal of the sanctity of human life.

98 Wash.2d at 482, 656 P.2d at 497.

Our inability to find an injury to Pierce does not, of course, rely on any claim that recognizing such an injury constitutes a "disavowal of the sanctity of human life," but only on the fundamental conceptual impossibility of determining what that injury is. We are not satisfied, therefore, that *Harbeson* adequately specifies the injury an impaired child suffers in being born. We can only conclude that the Washington Supreme Court, as did the Supreme Courts of California and New Jersey, chose to disregard the child's failure to prove an injury in light of its perception that the equities of permitting the child to recover special damages were entitled to greater weight.

In the end, the question must be whether we will continue to adhere to well-established tort principles, or instead will discard those principles so as to permit a plaintiff to recover damages from a defendant who cannot fairly be said to have caused any injury to the plaintiff.

The fundamental concern of tort law is to determine when the responsibility for, and the burden of, an injury should be shifted from the injured party to some third person. To discard the requirement that a plaintiff prove that he has been injured would carry tort law well beyond its proper, principled boundaries. Absent any demonstrable injury to the plaintiff, there is no burden for which a third party may be held to answer. *See also Nelson v. Krusen,* 678 S.W.2d 918, 924–25 (Tex.1984) (recognition of limited cause of action for special damages in wrongful life cases does not avoid problem of following basic rule of tort compensation that "plaintiff is to be put in the position that he would have been in absent the defendant's negligence."); *Procanik,* 97 N.J. at 369, 478 A.2d at 772 (Schreiber, J., dissenting in part) ("The position that the child may recover special damages despite the failure of his underlying theory of wrongful life violates the moral code underlying our system of justice from which the fundamental principles of tort law are derived.").

We do not question that Pierce will face substantial expenses throughout his life with respect to his blindness. We merely conclude that his life, however impaired and regardless of any attendant expenses, cannot rationally be said to be a detriment to him when measured against the alternative of his not having existed at all. By so finding, we reiterate that a plaintiff's right to recover turns on no more a "fortuitous circumstance" or anomaly than that the plaintiff demonstrate that he has suffered an injury.

We conclude, therefore, that the complaint fails to state a claim on behalf of

Pierce upon which relief may be granted. Accordingly, the judgment of the district court dismissing Pierce's claim is affirmed, the dismissal of the Liningers' claim is reversed, and the case is remanded for further proceedings consistent with this opinion.

ERICKSON, J., concurs in part and dissents in part.

MULLARKEY, J., concurs in part and dissents in part, and LOHR, J., joins in the concurrence and dissent.

ERICKSON, Justice, concurring in part and dissenting in part:

I concur in the result, and dissent to that part of the opinion that addresses damages for wrongful birth.

I agree with the majority's conclusion that the trial court erred in granting summary judgment on the Liningers' claim for "wrongful birth." In its August 26, 1986 order dismissing the case with prejudice, the trial court stated that "the motions of defendants for summary judgment are granted." Under C.R.C.P. 56, we need only determine if there is any "genuine issue of material fact and [whether] the moving party is entitled to a judgment as a matter of law." Since this court has concluded that the defendants were not entitled to dismissal as a matter of law, and there are genuine issues of material fact, summary judgment should not have been granted on the Liningers' "wrongful birth" claim. We need not address any other issues raised.

In my view, the proper measure of damages for the Lininger's claim should not be addressed in reviewing the motion for summary judgment. The majority points out in footnote 9 that this court denied certiorari on the issue of the proper measure of damages. The majority opinion acknowledges the difficulty in addressing the issue at this stage of the proceedings. On the one hand, the majority holds that in the event the plaintiffs prevail on the "wrongful birth" claims, they may "recover those extraordinary medical and educational expenses occasioned by Pierce's blindness."

At 1207. On the other hand, the majority "express[es] no opinion as to whether other damages may be recovered...." *Id.* at 1207. If the plaintiffs do not prevail at trial, the measure of damages awarded in future "wrongful birth" cases will be governed by a precedent that resulted from the virtually nonexistent record before us. Given the procedural posture of this case and the lack of a record relating to damages, I think it is premature to address the damage issue at this time.

I also believe that labelling the claim as one for "wrongful birth" confuses the analysis of the case. The majority states "As we have explained above, however, the complaint states a cause of action within the confines of common law negligence." At 1208. Since those claims for relief identified in the complaint as "wrongful birth" claims sound in traditional negligence and medical malpractice, I believe that denominating the claims as "wrongful birth" claims clouds the issue. "Wrongful birth" is a misnomer that does not identify the underlying tort as much as it inartfully describes the result of the tort. It is not the birth of Pierce Lininger that gives rise to the plaintiffs' claim for relief. Rather, it is the alleged negligent failure to diagnosis Pierce's congenital condition that forms the basis of the plaintiffs' complaint.

Because I believe that the majority analyzes the issue within the traditional negligence/malpractice framework, and reaches the proper result, I concur in the result and agree that the trial court erred in granting summary judgment on the claims referred to as "wrongful birth" claims. I agree with the majority in concluding that the claims for "wrongful life" were properly dismissed, and reflect an improper designation of the claims asserted.

MULLARKEY, Justice, concurring in part and dissenting in part:

I respectfully dissent from Part II.B of the majority opinion because I believe that Pierce Lininger (Pierce) stated a claim for relief which is sufficient to withstand a motion to dismiss. In *Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988), we rejected

the tort of clergy malpractice but allowed the plaintiffs to proceed with their claims for breach of fiduciary duty and outrageous conduct. So too in this case while we reject the tort of wrongful life, we should recognize that Pierce has stated claims for lack of informed consent and negligent misrepresentation.

"Wrongful life" is a label which is misleading and decidedly unhelpful. As one commentator noted, the term prevents analytical clarity. Capron, *Tort Liability in Genetic Counseling*, 79 Colum.L.Rev. 618, 647 (1979). The allegation which has come to characterize the tort of wrongful life (and which is present in the case now before us) is that, if the physicians had properly diagnosed and advised the plaintiffs with respect to a genetic condition, the parents would not have conceived or borne the child. This allegation poses the existence/nonexistence dilemma which so troubles the majority in its analysis of Pierce's claim. In my view, that allegation is immaterial with respect to claims for lack of informed consent and negligent misrepresentation. This fact is demonstrated by the majority's treatment of the parents' claim in this case which summarily rejects the existence/nonexistence dilemma. *See* at 1206.

Since the claims of Pierce and his parents are so closely related and, indeed, mutually dependent, I see no reason to deny one while allowing the other to stand. The injury suffered by both the parents and Pierce occurred because the doctors failed to properly diagnose an hereditary condition in Pierce's older brother. Because of this misdiagnosis, the physicians advised the parents that there was no increased risk that any subsequent children also would be born blind. The Liningers sought the genetic counseling not only for themselves but also for their future children. Neither they nor Pierce can claim any right that Pierce be born a perfect child. What both Pierce and his parents can and do claim is that, in reliance on the physicians' advice, they intended to assume only the ordinary risks inherent in any decision to bear children. They did not intend to assume the very high risk of a one-in-four probability that Pierce would be born blind.

The essence of the complaint by Pierce and his parents is that the physicians, through their negligent misrepresentation, deprived the parents of the opportunity to make an informed decision on whether to bear another child. This was a decision made by the parents on their own behalf and on behalf of Pierce. The physicians took that decision away from the parents and, by their negligence, made that decision for the parents and for Pierce. That denial of an informed decision is the injury caused to Pierce by the physicians' negligence. It is a basic and fundamental injury to the Lininger family, and both the parents and Pierce should be permitted to sue for negligence.

Allowing Pierce to maintain an action for negligence is consistent with traditional tort analysis. Claims based on informed consent have evolved as a variant of medical malpractice. *Bloskas v. Murray*, 646 P.2d 907, 914 (Colo.1982); *see Stauffer v. Karabin*, 30 Colo.App. 357, 492 P.2d 862 (1971). The law imposes upon a physician the duty of disclosing to the patient certain information essential to the patient's informed consent to the performance of a medical or surgical procedure on the patient. *Bloskas*, 646 P.2d at 914. Where a risk is one which would be medically significant to a patient's decision, and the risk is known or ought to be known by the physician, then it is a "substantial" risk and should be disclosed to the patient. *Bloskas*, 646 P.2d at 913; *Mallett v. Pirkey*, 171 Colo. 271, 284–85, 466 P.2d 466, 472–473 (1970). A physician may establish that his action or inaction complied with medical standards as a defense to this type of claim. *Bloskas*, 646 P.2d at 913, n. 6; *Mallett*, 171 Colo. at 282, 466 P.2d at 471.

Our decision in *Bloskas* also was grounded upon the tort of negligent misrepresentation, which we recognized as a claim for relief separate from and not subsumed within informed consent. 646 P.2d at 913–14. We adopted section 311 of the *Restatement (Second) of Torts* (1965) which sets forth the elements of the claim:

Negligent Misrepresentation Involving Risk of Physical Harm

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results (a) to the other, or (b) to such third persons as the actor should expect to be put in peril by the action taken.

(2) Such negligence may consist of a failure to exercise reasonable care (a) in ascertaining the accuracy of the information, or (b) in the manner in which it is communicated.

*Bloskas,* 646 P.2d at 914. We also noted Comment b to section 311 which states that these principles find particular application where "it is part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends." We concluded that there was "no reason not to extend [the doctrine of negligent misrepresentation] to representations made in the course of [a physician-patient] relationship." *Id.*

The physician's duty of care clearly extended to Pierce. It is well-established that a physician owes a duty of care to an infant who is born alive and the infant has an independent claim for relief based on breach of that duty. *E.g., Hopkins v. McBane,* 359 N.W.2d 862, 864 (N.D.1984) ("In accord with the nearly unanimous weight of authority, we hold that ... there exists a cause of action by a child who is born alive for damages for prenatal injuries caused by the tortious conduct of another."); *Restatement (Second) of Torts* § 869(1) (1977); Note, *Informed Consent: An Unborn's Right,* 48 Alb.L.Rev. 1102 (1984); *cf. Espadero v. Feld,* 649 F.Supp. 1480 (D.Colo.1986) (wrongful death action may be maintained under Colorado law for the death of a viable fetus); *Callaham v. Slavsky,* 153 Colo. 291, 385 P.2d 674 (1963) (affirming judgment awarding damages for the wrongful death of a child who suffered prenatal injuries in a car accident). *See generally* Annotation, *Liability for Prenatal Injuries,* 40 A.L.R.3d 1222 § 9 (1971 & Supp.1988). Depending on the facts, the physician's duty may extend to a child not yet conceived at the time of the negligent act. *Empire Casualty Co. v. St. Paul Fire & Marine Ins. Co.,* 764 P.2d 1191 (Colo.1988). *See also Bergstreser v. Mitchell,* 577 F.2d 22 (8th Cir.1978); *Renslow v. Mennonite Hosp.,* 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977). *See generally* Annotation, *Liability for Child's Personal Injuries or Death Resulting from Tort Committed Against Child's Mother Before Child was Conceived,* 91 A.L.R.3d 316 (1979 & Supp.1988).

Negligent misrepresentation is particularly appropriate here because it is specifically applicable to those situations where a third party, such as a potential child, is foreseeably endangered. *Restatement (Second) of Torts* § 311 (1965). In a genetic counseling case similar to the one now before us, the Minnesota Supreme Court held that an infant stated a claim for negligent nondisclosure by physicians. *Pratt v. University of Minn. Affiliated Hosp. & Clinics,* 414 N.W.2d 399 (Minn.1987).

Finally, I note that it is anomalous to recognize the parents' claim and deny the child's claim. This will lead to hardship because any damages awarded would terminate when the child is emancipated and the failure of the parents to promptly pursue their claim would foreclose any relief being granted. This denial of the child's claim only serves to immunize negligent physicians.

Pierce's claims for lack of informed consent and negligent misrepresentation should be reinstated.

I am authorized to say that Justice LOHR joins in this concurrence and dissent.