Argued and submitted December 10, 2013, reversed and remanded as to the
Tomlinsons' negligence claim, otherwise affirmed December 30, 2015, petitions
for review allowed June 30, 2016 (359 Or 847)
See later issue Oregon Reports

Kerry TOMLINSON
and Scott Tomlinson, individually;
and Kerry Tomlinson
as guardian *ad litem* for her minor son
Edward Tomlinson,
*Plaintiffs-Appellants,*

*v.*

METROPOLITAN PEDIATRICS, LLC,
an Oregon limited liability corporation;
Legacy Emanuel Hospital & Health Center,
dba Legacy Emanuel Pediatric Development and
Rehabilitation Clinic;
and Mary K. Wagner, M.D.;
*Defendants-Respondents,*

*and*

LEGACY EMANUEL HOSPITAL
& HEALTH CENTER,
an Oregon non-profit corporation,
dba Legacy Emanuel Health Center;
and Sharon D. Butcher, CPNP,
*Defendants.*

Multnomah County Circuit Court
110911971; A151978

366 P3d 370

Kathryn H. Clarke argued the cause for appellants. With her on the briefs were William A. Gaylord, Linda K. Eyerman, and Craig A. Nichols.

Michael J. Estok argued the cause for respondents Metropolitan Pediatrics, LLC, and Mary K. Wagner, M.D. With him on the joint briefs were Lindsay Hart, LLP; Lindsey H. Hughes, Hillary A. Taylor, and Keating Jones Hughes, P.C.

Lindsey H. Hughes argued the cause for respondent Legacy Emanuel Hospital & Health Center. With her on the joint briefs were Hillary A. Taylor and Keating Jones Hughes, P.C.; Michael J. Estok and Lindsay Hart, LLP.

Before Lagesen, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

HASELTON, C. J.

---

* Haselton, C. J., *vice* Wollheim, S. J.

**HASELTON, C. J.**

Plaintiffs Kerry and Scott Tomlinson (the Tomlinsons) and their son, Edward Tomlinson (Teddy), through his mother as guardian *ad litem*, appeal a judgment dismissing their claims for negligence against defendants Metropolitan Pediatrics, LLC, and Mary K. Wagner, M.D. (collectively Metropolitan) and Legacy Emanuel Hospital & Health Center (Legacy), medical service providers for the Tomlinsons' older son Emanuel Tomlinson (Manny). In those claims, the Tomlinsons and Teddy each alleged that they suffered economic and noneconomic damages because defendants breached the professional standard of care that they owed to Manny by, *inter alia*, failing to diagnose him with a genetic condition and inform the Tomlinsons of that condition and their reproductive risks and, as a foreseeable result of that breach, the Tomlinsons, without that knowledge, conceived and bore Teddy—who suffers from the same genetic condition.

On appeal, plaintiffs contend that the trial court erred in granting defendants' motions to dismiss for failure to state a claim under ORCP 21 A(8) on the grounds that (1) no physician-patient relationship existed between plaintiffs and defendants; (2) the Tomlinsons' claim for "wrongful birth" and Teddy's claim for "wrongful life" are not cognizable in Oregon; and (3) the Tomlinsons failed to allege a physical injury or other legally protected interest as a basis for their recovery of noneconomic damages. Defendants cross-assign error to the trial court's denial of Legacy's motions to dismiss under ORCP 21 A(9) on the ground that the action was barred by the statute of limitations and statute of repose and the court's failure to grant defendants' motions to strike allegations in the complaint under ORCP 21 E and to make the complaint more definite and certain under ORCP 21 D on the ground that those motions were "moot" in light of its dismissal of plaintiffs' claims.

For the reasons that follow, we conclude that the trial court (1) erred in granting the motion to dismiss the Tomlinsons' claim because, under established negligence principles in Oregon, they stated a claim for relief, but (2) properly granted the motion to dismiss Teddy's claim,

because he failed to allege legally cognizable damages. We also reject without further written discussion defendants' cross-assignments of error concerning their motions to dismiss on statute of limitations and repose grounds. Accordingly, we reverse and remand the Tomlinsons' negligence claim—a disposition that, in this procedural posture requires the trial court to consider, in the first instance, defendants' motions to strike and to make the Tomlinsons' claim more definite and certain—but otherwise affirm.

## I. FACTS

Plaintiffs' operative amended complaint alleged the following material facts:

The Tomlinsons have two children, Manny, who was born in 2003, and Teddy, who was born in 2008. Shortly after his birth, Manny "began to exhibit developmental abnormalities and symptoms of serious illness." The Tomlinsons "actively sought medical advice" from defendants, and "relied on the defendants * * * to exercise reasonable care, skill and diligence on their behalf."

Manny was defendants' patient.[1] "Over the course of numerous medical contacts with Manny, defendants, and each of them, undertook to assess the cause of Manny's developmental abnormality, but failed to diagnose it and failed to order or perform the appropriate diagnostic testing or referrals to do so." Ultimately, "[i]n October 2010, Manny was diagnosed with Duchenne's muscular dystrophy [(DMD)], a severe and progressively debilitating neuromuscular disorder characterized by muscle weakness and wasting, loss of the ability to walk (usually by age 12), progressive paralysis, and premature death." DMD "is a genetic disorder. Females may carry the recessive gene for [DMD] but do not suffer from the disease. If a couple has a child with [DMD],

---

[1] As plaintiffs explained in their opening brief on appeal, Manny is not a party to this action because, although defendants' alleged negligence "occurred during the course of his medical care, he was not seriously harmed by the diagnostic delay." Further, as explained in their response to defendants' motions to dismiss, "[the Tomlinsons] do not claim that they were patients of defendants, except to the extent that parents act on behalf of and as adult legal representatives for their children."

the chances are fifty percent that subsequent male children born to that couple will also have [DMD]."[2]

In the meantime—"while ignorant of the cause of their son Manny's developmental abnormalities"—the Tomlinsons conceived Teddy, who was born on November 12, 2008. Following Manny's diagnosis in 2010, "the Tomlinsons had Teddy tested." He "also has [DMD], and will suffer the same fate as his brother[.]"

Against that factual backdrop, plaintiffs alleged that defendants were negligent.[3] Specifically, plaintiffs alleged that defendants were negligent in one or more of the following ways:

"a)   in failing to recognize Manny's developmental abnormalities as possible symptoms of [DMD];

"b)   in failing to test Manny for [DMD];

"c)   in failing to properly diagnose Manny as suffering from [DMD];

"d)   in failing to inform the plaintiffs that Manny had [DMD];

"e)   in failing to advise and counsel the plaintiffs at any time before Teddy was conceived that there was a fifty percent likelihood that another male child born to them would also suffer from [DMD]; ***

"f)   failing to provide Manny with examination and diagnostic work up by a medical doctor in a specialty field whose training qualified them to diagnose neuromuscular disorders, developmental delays, genetic disorders, or muscular dystrophy;

---

[2] Plaintiffs also alleged that "[d]efendants had an ongoing duty to properly diagnose Manny's condition from November 16, 2004 until the diagnosis of [DMD] was finally made in October[] 2010." Legacy moved to strike that allegation on the ground that it was a legal conclusion. The trial court determined that its dismissal of plaintiffs' claims rendered that motion moot. Our disposition of the Tomlinsons' claim will require the trial court to address the merits of that motion in the first instance. In all events, for purposes of our analysis, we disregard the allegation of ongoing duty because it is immaterial to our resolution of the parties' contentions.

[3] Plaintiffs' specifications of negligence as to Legacy and Metropolitan were stated in two separate paragraphs of the complaint. The content of those paragraphs is essentially the same except for one allegation—*viz.*, allegation (g)—which pertains only to Legacy. For convenience, we quote only the paragraph of the complaint stating the specifications of negligence as to Legacy.

"g)   in failing to provide Manny with examination and diagnostic work up by any medical doctor; [and]

"h)   in failing to pursue a diagnosis for the cause of Manny's abnormally low muscle tone (hypotonia) until genetic conditions such as [DMD] were ruled out or a reasonable explanation for his condition was found."

With regard to their claim, the Tomlinsons further alleged that, "[a]s a direct and foreseeable result of the negligence set forth * * * above, plaintiffs unknowingly conceived and bore a child with a severe genetic defect" and "[h]ad defendants, and each of them, timely diagnosed Manny's DMD, plaintiffs would not have produced another child suffering from [DMD]." Each of the Tomlinsons sought noneconomic damages of $5 million, alleging that each "has suffered and will continue to suffer extraordinary physical demands in caring for, transporting and assisting * * * Teddy, resulting in increased susceptibility to physical injury, and severe emotional distress[.]" The Tomlinsons also alleged $995,428 in damages for the "extraordinary costs for the medical care, education and support [that] Teddy will require because of his genetic condition for the remainder of his minority[.]"

With regard to his claim, Teddy, in addition to the preceding allegations, alleged:

"As a direct and foreseeable result of the negligence of the defendants, and each of them, Teddy * * * was born with [DMD], and will suffer muscle weakness and wasting, loss of the ability to walk, progressive paralysis, and premature death. He will become increasingly disabled and totally dependent on others for his care and his most basic functions, and will never be able to work or to participate in or enjoy many of the activities that healthy people enjoy. He carries an increased likelihood of cognitive and behavioral problems and will experience physical and emotional pain and suffering, including the emotional pain and suffering associated with the knowledge of his own premature death, as well as emotional pain and suffering associated with his knowledge and awareness of the grief, anguish and emotional pain and suffering of his parents on account of his incurable illness and early death, all to his non-economic damages in the amount of $10,000,000.00."

Further, Teddy alleged that he was entitled to damages for lost future earning capacity and over $2 million in damages for "extraordinary costs" that he will incur "upon reaching the age of majority and for the remainder of his anticipated lifetime thereafter" for "the medical care, education and support [that] he will require on account of his genetic condition[.]"

## II. PROCEDURAL HISTORY

Defendants filed 19 motions challenging the sufficiency of plaintiffs' complaint. As pertinent to the issues raised on appeal, those motions fell into three discrete categories: (1) motions to dismiss for failure to state a claim under ORCP 21 A(8); (2) motions to dismiss under ORCP 21 A(9) on the ground that the action was barred under the statute of limitations and statute of repose; and (3) motions to strike under ORCP 21 E and motions to make the complaint more definite and certain under ORCP 21 D.

The narrative and analysis that follows pertains solely to the motions to dismiss the Tomlinsons' and Teddy's negligence claims. That is so because, as noted, we have already rejected without discussion defendants' cross-assignments pertaining to the second category of motions, *see* 275 Or App at 660-61, and our disposition as to the Tomlinsons' negligence claim requires that the trial court consider, in the first instance, the third category of motions that are the subject of defendants' remaining cross-assignments, *see id.* Before turning to those motions, however, we briefly address an issue of terminology and approach so as to provide context for the parties' specific contentions.

### A. *Terminology and Approach*

The Tomlinsons' and Teddy's claims correspond, respectively, to what many other courts have denominated "wrongful birth" and "wrongful life" claims. In general terms, "wrongful birth" refers to "the cause of action of parents who claim that negligent advice or treatment by the defendant deprived them of the choice of avoiding conception or of terminating the pregnancy usually because of some genetic disability of the child." Gerald W. Boston ed., 2 *Stein on Personal Injury Damages* § 12:3 (3d ed 1997); *see id.*

("[T]he term 'wrongful birth' is limited by most courts to the parents' action in connection with the birth of a child with a disability, and the term 'wrongful pregnancy' or 'wrongful conception' is used for the parents' action in connection with the birth of a normal and healthy (but unplanned) child."). Relatedly, "wrongful life" refers to "a cause of action brought by or on behalf of a child with an impairment who claims that but for the defendant's negligence, the child would not have been born." *Id.* In this opinion, we eschew the use of those potentially "loaded" labels as unhelpful to our analysis, which turns on established negligence principles in Oregon. *See Zehr v. Haugen*, 121 Or App 489, 855 P2d 1127 (1993), *rev'd in part on other grounds*, 318 Or 647, 871 P2d 1006 (1994) (adopting a similar approach in a case described as one for "wrongful pregnancy").

## B. *Defendants' Contentions*

With that understanding in mind, we turn to defendants' contentions underlying their motions to dismiss for failure to state a claim under ORCP 21 A(8). Specifically, defendants advanced three alternative, but related, contentions in support of those motions.

*First,* defendants contended that, because plaintiffs failed to allege the existence of a physician-patient relationship between defendants and themselves, they failed to state claims for relief. Defendants asserted that, in a medical malpractice case, a physician-patient relationship must exist between defendants and plaintiffs. *See, e.g., Mead v. Legacy Health System*, 352 Or 267, 276, 283 P3d 904 (2012) ("In Oregon, as in most states, a physician-patient relationship is a necessary predicate to stating a medical malpractice claim."). According to defendants, because plaintiffs' claims are predicated on alleged medical negligence in the care and treatment of Manny—defendants' patient—the alleged duties were owed to Manny and not to plaintiffs. In other words, defendants essentially contended that nonpatients are categorically precluded from stating a negligence claim based on allegations that a physician's breach of the standard of care in the context of a physician-patient relationship foreseeably caused harm to third parties.

*Second,* although acknowledging that, in *Zehr v. Haugen,* 318 Or 647, 871 P2d 1006 (1994), the Supreme Court recognized a claim for "wrongful pregnancy," defendants contended that the Tomlinsons' claim for "wrongful birth" and Teddy's claim for "wrongful life" are not cognizable in Oregon. Specifically, and as pertinent to the issues on appeal, defendants asserted that their alleged conduct did not cause Teddy's genetic condition. Further, defendants asserted that, in the absence of any allegation of treatment, consultation, or reproductive or genetic counseling or screening, the injuries alleged in plaintiffs' complaint— Teddy's birth and his life with DMD—were not caused by defendants' alleged conduct pertaining to the timeliness of Manny's diagnosis.[4]

Defendants also contended that Teddy's claim is not cognizable because he has not "identif[ied] a legal injury measurable in damages." According to defendants, Teddy alleged that he has been damaged by the fact of his existence. Significantly, defendants asserted that "life" has not been recognized in Oregon as a compensable harm. Further, defendants posited that any damage that Teddy suffered is immeasurable because it is impossible to calculate damages based on a comparison between the value of Teddy's nonexistence and the value of his life with DMD.

*Third,* defendants contended that plaintiffs' allegations are legally insufficient to support their request for noneconomic damages. Specifically, defendants contended that plaintiffs failed to allege a physical injury or an invasion of a legally protected interest under Oregon law, which is generally required for the recovery of noneconomic damages for emotional distress. *See Paul v. Providence Health System-Oregon,* 351 Or 587, 597, 273 P3d 106 (2012) (stating that the Supreme Court "consistently has rejected claims for emotional distress damages caused by a defendant's negligence, in the absence of any physical injury"); *id.* at 597-98 (noting an exception to the physical-injury rule "where

---

[4] Defendants also moved to dismiss plaintiffs' negligence claims on the ground that the allegations did not demonstrate that plaintiffs could prove causation to the level of a "probability." The trial court ultimately denied those motions, and defendants do not cross-assign error to those rulings on appeal. Accordingly, we do not discuss those motions further.

the defendant's conduct infringed on some legally protected interest apart from causing the claimed distress, even when that conduct was only negligent" (internal quotation marks omitted)).

Legacy further contended that, because the Tomlinsons cannot recover noneconomic damages for emotional distress, their claim reduced to one of purely economic loss for the extraordinary costs of caring for Teddy—costs which are generally not recoverable in a negligence action in the absence of a duty beyond the common-law negligence standard. *See Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004) ("[L]iability for purely economic harm must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." (Internal quotation marks omitted.)); *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987) ("[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property.").

C.  *Plaintiffs' Responses*

Plaintiffs remonstrated that they have stated legally cognizable claims. Specifically, in response to defendants' contentions, they advanced three alternative but related contentions of their own, each of which we describe in turn.

*First*, although plaintiffs conceded that "a physician's duty to exercise reasonable care arises out of the physician-patient relationship" and that a physician-patient relationship did not exist between defendants and themselves, they contended that such a relationship is not a necessary prerequisite for stating a negligence claim. Instead, plaintiffs asserted that a physician-patient relationship existed between defendants and Manny that gave rise to defendants' duty to exercise reasonable care in their treatment of him—an assertion that defendants do not dispute. Plaintiffs further asserted that Oregon law "recognizes that a health care provider's breach of the duty to exercise reasonable care *** can cause foreseeable harm to individuals who are not the 'patient.'" *See, e.g., Zehr*, 318 Or 647 (recognizing claim for negligently performed tubal ligation brought by *husband*

and wife); *Zavalas v. Dept. of Corrections*, 124 Or App 166, 173, 861 P2d 1026 (1993), *rev den*, 319 Or 150 (1994) (rejecting "defendant's position that under no circumstances can a physician ever be liable to a nonpatient third party"). According to plaintiffs,

> "[r]egardless of the label defendants want to put on the cause of action, it is nothing more and nothing less than a negligence claim. The fact that the claim arises in a professional context does not change the elements of negligence that must be alleged; it may simply mean that expert testimony will be required to prove them. Plaintiffs' evidence will establish that the standard of care required defendants to undertake to diagnose the cause of Manny's developmental abnormalities, and doing so would have led to the knowledge that Manny had [DMD]. The standard of care would also have required defendants to inform plaintiffs of what the diagnosis meant and its potential consequences. There is no question here that Manny's parents—and their right to make informed choices regarding their future and their family—were foreseeably affected by the defendants' failure to take reasonable steps to diagnose the child they were treating."

*Second*, relying on *Zehr* and cases from other jurisdictions, plaintiffs contended that application of basic negligence principles demonstrated that their claims are cognizable in Oregon. They explained that the Tomlinsons had an important interest in making "informed choices regarding their future and family" and that the labels of "wrongful birth" and "wrongful life" obscure the proper analysis because

> "'[a]ny "wrongfulness" lies not in the life, the birth, the conception, or the pregnancy, but in the negligence of the physician. The harm, if any, is not the birth itself but the effect of the defendant's negligence on the parents' physical, emotional, and financial well-being resulting from the denial to the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect.'"

(Quoting *Viccaro v. Milunsky*, 406 Mass 777, 779 n 3, 551 NE2d 8, 9 n 3 (1990).)

Further, as to Teddy's claim, plaintiffs noted that "defendants set in motion a series of events which led to Teddy being born with" DMD and that Oregon courts should decline defendants' invitation to "condemn as a metaphysical conundrum" the comparison between the value of Teddy's nonexistence and the value of his life with DMD. That is so, plaintiffs contended, because Teddy's injury is not "life itself" but rather "the impairment that accompanies the life as a result of the defendants' conduct" and "[i]t is no more difficult for a factfinder to assess the economic and mental/emotional consequences of living with that impairment than it would be in any other case."

*Third*, plaintiffs contended that the Tomlinsons' recoverable damages included noneconomic damages for emotional distress for either or both of two reasons: (1) The allegations concerning "the process of bearing, rearing and caring for a severely disabled child involve[] a 'physical impact'";[5] and (2) the Tomlinsons' legally protected interest in making "informed choices whether to bear a child or whether to bear a child with a genetic or other defect" was infringed so as to permit recovery of noneconomic damages for emotional distress even in the absence of a cognizable "physical impact."

D.  *Trial Court's Ruling*

The trial court granted defendants' motions to dismiss under ORCP 21 A(8) for failure to state a claim. The court's primary rationale was that plaintiffs failed to allege the existence of a physician-patient relationship between defendants and themselves. Specifically, the court reasoned that, in light of the "medical negligence case law developed in this jurisdiction" and the reasoning in *Mead*, "to survive dismissal, a complaint must include an allegation of a professional relationship between a physician and patient in a

---

[5] Specifically, in their response to defendants' motions to dismiss, plaintiffs explained:

"Plaintiffs point out that the exhausting physical demands of caring for a second severely disabled child—bathing him, dressing him, putting on and taking off his leg braces, helping him into and out of his wheelchair, taking him to numerous medical and therapy appointments, to mention only a few of the necessary tasks—constitute 'physical consequences.'"

medical malpractice case." As the court explained, in this case, "[a]ll parties * * * agree that none of the plaintiffs is, or was, a patient of defendants."

In addition to its primary rationale, the court advanced alternative reasons that the Tomlinsons and Teddy had each failed to otherwise allege legally cognizable negligence claims. With regard to the Tomlinsons' claim, the court noted that "the pleading lacks any claim that [the Tomlinsons] treated with, or relied upon, the advice of [defendants] in deciding whether to conceive a second child. In this regard, this case differs from other so-called wrongful birth cases that have come before the court in which such reliance has been pled." Further, the court dismissed the request for emotional distress damages because "[n]o physical impact or duty to plaintiffs to avoid emotional harm has been alleged."

As to Teddy's claim, the court reasoned that a "wrongful life" claim is not cognizable in Oregon. Specifically, the court explained that "there is no yardstick by which to measure his damages" and that it "agree[d] with the reasoning of those courts [that] have examined such causes of action and conclude[d] that the viability of such claims is better left to policy-makers than to judges and juries."

## III. ANALYSIS

On appeal of the resulting judgment, plaintiffs assign error to the trial court's dismissal of their claims, essentially reiterating the contentions that they raised before the trial court. We begin by addressing the trial court's primary rationale for dismissing plaintiffs' claims—*viz.*, the lack of a physician-patient relationship between defendants and plaintiffs—which, if correct, would be dispositive as to both the Tomlinsons' and Teddy's claims and would obviate the need to address the parties' other contentions. However, because we conclude that such a relationship is not a necessary prerequisite, we then proceed to address the trial court's alternative reasons for dismissal.

### A.  *Standard of Review*

In reviewing a trial court's dismissal under ORCP 21 A(8), "we accept as true all well-pleaded allegations of

fact in the complaint and give plaintiffs the benefit of all favorable inferences that may be drawn from the facts alleged" but "disregard any allegations that state conclusions of law." *Gafur v. Legacy Good Samaritan Hospital,* 344 Or 525, 528-29, 185 P3d 446 (2008). With that standard in mind, we turn to the issue whether plaintiffs' claims were legally insufficient because they failed to allege a physician-patient relationship between defendants and themselves.

## B.  *The Necessity of a Physician-Patient Relationship*

Whether such a relationship is required turns on whether nonpatients who allege that they were foreseeably harmed as a result of a physician's breach of a standard of care are categorically foreclosed from asserting a negligence claim against the physician. Consistently with defendants' contentions, the trial court concluded that, because plaintiffs had not alleged a physician-patient relationship between defendants and themselves, they could not state a negligence claim under the circumstances alleged here. For the reasons that follow, we conclude that the trial court's conclusion was erroneous.

"[U]nder Oregon common law, a person whose negligent conduct unreasonably creates a foreseeable risk of harm to others and causes injury to another ordinarily is liable in damages for that injury." *Harris v. Suniga,* 344 Or 301, 307, 180 P3d 12 (2008). As the Supreme Court explained in *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 17, 734 P2d 1326 (1987),

"unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

In applying that principle, "we generally analyze a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of 'reasonable foreseeability' rather than the more traditional 'duty of care'"; however,

"if the plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may create, define, or limit the defendant's duty to the plaintiff[.]" *Stewart v. Kids Incorporated of Dallas, OR*, 245 Or App 267, 275, 261 P3d 1272 (2011), *rev dismissed as improvidently allowed*, 353 Or 104 (2012) (some internal quotation marks and citations omitted).

In dismissing plaintiffs' claims, the trial court necessarily accepted the fundamental principle underlying defendants' contrary contentions—*viz.*, that nonpatients are precluded from stating a negligence claim based on allegations that they were foreseeably harmed by a physician's breach of a professional standard of care owed to a patient that requires the physician to exercise care on behalf of nonpatients. As we explain, however, *Mead*—the case on which the trial court principally relied—does not support the trial court's conclusion.

In *Mead*, "[a]n emergency room doctor telephoned defendant (an on-call neurosurgeon) to ask his advice about plaintiff, who had come into the emergency room for treatment." 352 Or at 269. The plaintiff filed a negligence claim against the neurosurgeon that "rested on the premise that, as a result of the telephone call defendant received * * *, defendant had entered into a physician-patient relationship with plaintiff and, as a result, owed her a duty of due care." *Id.* at 271. Under those circumstances and in the course of upholding the trial court's denial of the plaintiff's motion for a directed verdict, the Supreme Court stated the principle on which the trial court and defendants relied in this case:

> "*In Oregon, as in most states, a physician-patient relationship is a necessary predicate to stating a medical malpractice claim. See Dowell v. Mossberg*, 226 Or 173, 181-83, 355 P2d 624, *rev'd on reh'g on other grounds*, 359 P2d 541 (1961); David W. Louisell & Harold Williams, 1 *Medical Malpractice* § 8.03[1] at 8-17 (2009) (summarizing decisions from other states). As this court recognized in *Dowell*, without a physician-patient relationship, '"there c[an] be no duty to the plaintiff, and hence no liability."' *Dowell*, 226

Or at 181-82 (quoting *Currey v. Butcher*, 37 Or 380, 385, 61 P 631 (1900)).”

*Mead*, 352 Or at 276 (brackets in *Mead*; emphasis added).[6]

Thus, the issue in *Mead* was whether the plaintiff—whose negligence claim was premised on the existence of a physician-patient relationship—had demonstrated the existence of that relationship. Although the court noted that “a physician-patient relationship is a necessary predicate to stating a medical malpractice claim,” the court did not hold that a plaintiff is categorically precluded from stating a negligence claim against a physician where the professional standard of care owed to a patient requires the physician to exercise care on behalf of nonpatients. That is so because, under the circumstances in *Mead*, the Supreme Court had no reason to—and did not—address the cognizability of such a claim.[7]

However, we have effectively already considered and answered that question. In *Zavalas*, we held that the absence of a physician-patient relationship did not preclude nonpatients from recovering in negligence against the physician.

---

[6] *See also Son v. Ashland Community Healthcare Services*, 239 Or App 495, 506, 244 P3d 835 (2010), *rev den*, 350 Or 297 (2011) (noting—in the context of a case in which a physician-patient relationship existed—that claims for negligence involve a special relationship between the plaintiff and the defendant and require that a plaintiff plead and prove, among other things, “a duty that runs from the defendant to the plaintiff”); *Spiess v. Johnson*, 89 Or App 289, 292, 748 P2d 1020, *aff'd by equally divided court*, 307 Or 242, 765 P2d 811 (1988) (reasoning that the plaintiff had failed to state negligence claims because he failed to allege a physician-patient relationship between his former wife’s psychiatrist and himself and because his allegations of negligent conduct fell “squarely within the legislatively abolished tort of alienation of affections”); *Sullenger v. Setco Northwest*, 74 Or App 345, 348, 702 P2d 1139 (1985) (rejecting the plaintiff’s contention that the defendant physician had a duty to treat or render care to the plaintiff’s child in the absence of a physician-patient relationship with the child because “foreseeability of harm * * * gives rise to a duty”; reasoning that “[t]he concept of ‘foreseeability’ is applicable to the measurement of the scope or extent of a duty of care, but it does not determine the existence of such a duty”).

[7] Nor, as nearly as we can discern, did the court so hold in *Zehr*. In that case, the Supreme Court held that a husband had stated a negligence claim against his wife’s obstetrician for failing to perform a tubal ligation. 318 Or at 653-54. However, based on our review of the appellate briefs in *Zehr*, the issue of whether husband was required to allege a physician-patient relationship between defendants and himself was not before the courts. For that reason, *Zehr* does not meaningfully inform the analysis of that issue.

In *Zavalas*, the defendant physician prescribed medication for a patient who was later involved in an auto accident. The plaintiffs—the representatives of the children who died or were injured in the accident and the parents of the injured children—brought a negligence action against the physician, alleging that the physician "was negligent in prescribing Xanax to [the patient] when she presented symptoms of 'psychotic illness, depression, chronic bipolar mental disorder and chronic drug use,' and in authorizing the refill of that prescription." 124 Or App at 170. The physician in *Zavalas* asserted that "an entire category of claimants—nonpatients—is prohibited from recovering against a physician for alleged acts of negligence in treating a patient." *Id.* at 171. In asserting that "'no duty' defense," the physician in *Zavalas* contended that, as a matter of law, "a physician has no duty to third parties and, therefore, * * * a physician is shielded from liability to third parties who claim that the physician's negligent treatment of a patient was the foreseeable cause of their harm." *Id.* We rejected the physician's contention that "under no circumstances can a physician ever be liable to a nonpatient third party." *Id.*; *see also Delaney v. Clifton*, 180 Or App 119, 124, 41 P3d 1099, *rev den*, 334 Or 631 (2002) ("To be sure, the court in *Zavalas* held that professionals are not entitled to the benefit of an across-the-board 'no duty' rule merely because they are not in privity with those whom their negligent conduct affects."); *Docken v. Ciba-Geigy*, 86 Or App 277, 739 P2d 591, *rev den*, 304 Or 405 (1987) (physician's failure to warn of the dangers of a prescription drug extended to third parties who are foreseeably injured by that negligence); *Verd v. I-Flow, LLC*, No 3:11-CV-00677-AA, 2013 WL 2178081 at *4 (D Or May 14, 2013) (citing *Zavalas* and *Docken* for the proposition that "Oregon law authorizes a non-patient third party to assert claims against a physician based on that physician's negligent care of a patient"); *cf. Hale v. Groce*, 83 Or App 55, 57, 730 P2d 576 (1986), *rev'd in part on other grounds*, 304 Or 281, 744 P2d 1289 (1987) (holding that trial court erred in dismissing negligence action against the defendant, an attorney, on the ground that, because the plaintiff was not the defendant's client, there was no privity between them; accepting the plaintiff's argument that the privity requirement did not apply because the "case involves a certain,

direct and foreseeable connection between the lawyer's negligence and the third party's injury" (internal quotation marks omitted)).[8]

Here, as noted, 275 Or App at 675, defendants contend that a physician-patient relationship between themselves and plaintiffs is a necessary prerequisite to stating a negligence claim. That contention is materially indistinguishable from the "no duty" rule that we rejected in *Zavalas*. For that reason, the trial court erred in dismissing plaintiffs' claims on the ground that plaintiffs failed to allege a physician-patient relationship between defendants and themselves.

## C. *The Cognizability of Plaintiffs' Negligence Claims*

Accordingly, we turn to the trial court's alternative reasons for dismissing plaintiffs' claims. In doing so, we address the Tomlinsons' and Teddy's claims separately because each claim implicates different legal principles. Ultimately, as amplified below, we conclude that, although the Tomlinsons stated a legally sufficient negligence claim, Teddy did not.

### 1. *The Tomlinsons' claim*

#### a. Sufficiency of allegations of causation

The trial court articulated two additional reasons that the Tomlinsons had failed to state a claim. First, the court concluded that the Tomlinsons had failed to allege that defendants caused their injury. Specifically, the court stated that

"the pleading lacks any claim that [the Tomlinsons] treated with, or relied upon, the advice of [defendants] in deciding

---

[8] Defendants attempt to distinguish both *Zavalas* and *Docken* on the ground that they did not involve allegations of medical negligence. Specifically, defendants assert that *Zavalas* is "analogous to a drunk-driver case involving the Dram Shop Act or social host liability" because it concerns "the responsibility of a person (physician or otherwise) to control the conduct of a third person to prevent them from causing physical harm to others" and that *Docken* is simply a products liability case involving a physician's failure to warn. However, contrary to defendants' assertions, *Zavalas* and *Docken* both involved negligence claims alleging that a physician's breach of the standard of care in the context of a physician-patient relationship foreseeably caused harm to third parties.

whether to conceive a second child. In this regard, this case differs from other so-called wrongful birth cases that have come before the court in which such reliance has been pled."

Second, the court concluded that "[n]o physical impact or duty to plaintiffs to avoid emotional harm has been alleged" to support the Tomlinsons' request for emotional distress damages. We turn first to the adequacy of the Tomlinsons' allegations pertaining to causation.

To survive a motion to dismiss a negligence claim, a complaint

"must allege facts from which a factfinder could determine (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) *that the conduct was a cause of plaintiff's harm*, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent."

*Solberg v. Johnson*, 306 Or 484, 490-91, 760 P2d 867 (1988) (emphasis added). Defendants' motions to dismiss in this case implicated the fourth factor—that is, whether the Tomlinsons alleged that defendants' conduct "was a cause of plaintiffs' harm." *Id.* at 490.

To be sure, the Tomlinsons do not allege that defendants' negligence caused Teddy's genetic condition, nor could they. Rather, they posit a construct of causation predicated on the following interlocking premises: (1) Although no physician-patient relationship existed between defendants and plaintiffs, a physician-patient relationship existed between defendants and Manny. (2) That relationship, in turn, gave rise to a professional standard of care. (3) Defendants breached that standard of care by, *inter alia,* failing to diagnose Manny with a genetic condition and failing to inform the Tomlinsons of his condition and "to advise and counsel the [Tomlinsons] at any time before Teddy was conceived that there was a fifty percent likelihood that another male child born to them would also suffer from [DMD]." (4) As a foreseeable result of that breach, the Tomlinsons "unknowingly conceived and bore" Teddy—who has the same

genetic condition. (5) Thus, but for defendants' failure to timely diagnose Manny with DMD and inform the Tomlinsons of his condition and advise them of the reproductive consequences of that diagnosis, the Tomlinsons "would not have produced another child suffering from [DMD]."

The trial court concluded that those allegations collectively were legally insufficient to allege that defendants' conduct caused the Tomlinsons' harm. Specifically, the court noted that the circumstances of this case are materially distinguishable from cases in other jurisdictions on which the Tomlinsons relied to support the viability of their claim—*viz.*, several cases that involved circumstances in which, according to the Tomlinsons, "medical care providers had the opportunity yet failed to diagnose the congenital or hereditary nature of an older child's ailment before the parents unknowingly conceived and bore a second child suffering from the same genetic condition."[9] The trial court distinguished those cases on the ground that they involved allegations of actual parental reliance on the advice of medical professionals—allegations that are lacking in this case. Specifically, the court reasoned that "the pleading lacks any claim that [the Tomlinsons] treated with, or relied upon, the advice of [defendants] in deciding whether to conceive a second child."

With due appreciation of the trial court's careful consideration, we disagree. For the following reasons, we conclude that, despite the absence of affirmative allegations of reliance, the Tomlinsons have sufficiently alleged that defendants' conduct was the cause of their harm.

In a negligence action, a plaintiff must "prove an actual causal link between the defendant's conduct and the

---

[9] *See, e.g., Clark v. Children's Memorial Hosp.*, 353 Ill Dec 254, 955 NE2d 1065 (Ill 2011) (failing to diagnose older child with Angelman Syndrome due to an inherited gene mutation but representing to parents that the child's condition was not caused by a genetic abnormality); *Molloy v. Meier*, 679 NW2d 711 (Minn 2004) (failing to perform chromosomal testing for Fragile X on the older child but representing to parents that the child's developmental issues were not genetic in origin); *Lininger v. Eisenbaum*, 764 P2d 1202 (Colo 1988) (failing to diagnose older child with a hereditary form of blindness but representing that the child's condition was nonhereditary, a representation on which the parents relied in conceiving their second child).

plaintiff's harm—that is, the plaintiff must prove 'cause in fact.'" *Towe v. Sacagawea, Inc.*, 357 Or 74, 87, 347 P3d 766 (2015) (quoting *Oregon Steel Mills*, 336 Or at 340); *see Joshi v. Providence Health System*, 198 Or App 535, 538-39, 108 P3d 1195 (2005), *aff'd*, 342 Or 152, 149 P3d 1164 (2006) ("'Cause-in-fact' *** has a well-defined legal meaning: it generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed."). As the court explained in *Towe*, "[c]ausation is an assessment of whether a particular act or omission in fact resulted in the particular harm that a plaintiff suffered—it turns on 'what *retrospectively did* happen.'" *Id.* (quoting *Fazzolari*, 303 Or at 13 (emphasis in *Towe*)).

Here, the Tomlinsons alleged that, but for defendants' failure to diagnose Manny with DMD and inform them of his condition and their reproductive risks, they "would not have produced another child suffering from [DMD]." Those allegations directly link defendants' conduct—that is, their failure to diagnose Manny and inform the Tomlinsons of his condition and its implications for them—with the injury that the Tomlinsons suffered—that is, the infringement of their interest in making informed reproductive choices and avoiding conceiving or bearing Teddy. Assuming, as we must, that those facts, and all reasonable inferences drawn from them, are true, nothing more is necessary to sufficiently allege causation.[10] Accordingly, we turn to whether

---

[10] We appreciate that, as the trial court correctly noted, the circumstances of this case are factually distinct from cases on which the Tomlinsons relied—*viz.*, cases involving allegations of actual parental reliance on the advice of medical professionals. In this case, there are no allegations of treatment, consultation, or reproductive or genetic counseling or screening involving the Tomlinsons. Further, there are no allegations of affirmative misdiagnoses or representations on which the Tomlinsons relied in deciding to conceive another child.

However, as the Tomlinsons explain, many of those cases concerned the medical treatment of a child and, ultimately, the failure to diagnose "the congenital or hereditary nature of [an older child's] ailment before the parents unknowingly conceived and bore a second child suffering from the same genetic condition." Further, according to the Tomlinsons, where defendants negligently failed to diagnose Manny and failed to inform them of his genetic condition and their reproductive risks, their failure to allege that they inquired as to whether Manny might have a genetic condition so as to obtain some affirmative representation from defendants is not dispositive:

the Tomlinsons' allegations were legally insufficient to support their request for noneconomic damages.

> b. Sufficiency of allegations of "legally protected interest"

Generally, the Supreme Court "consistently has rejected claims for emotional distress damages caused by a defendant's negligence, in the absence of any physical injury." *Paul*, 351 Or at 597; *see also Hammond v. Central Lane Communications Center*, 312 Or 17, 23, 816 P2d 593 (1991) ("'[W]e have not yet extended liability for ordinary negligence to solely psychic or emotional injury not accompanying any actual or threatened physical harm or any injury to another legally protected interest.'" (Quoting *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 558-59, 652 P2d 318 (1982).)). "At a minimum, the physical impact rule requires an act or omission that results in some perceptible physical effect on a plaintiff." *Chouinard v. Health Ventures*, 179 Or App 507, 515, 39 P3d 951 (2002). "[T]he fact that a defendant's negligence poses a threat of future physical harm is not sufficient, standing alone, to constitute an actionable injury." *Lowe v. Philip Morris USA, Inc.*, 344 Or 403, 410, 183 P3d 181 (2008).

However, there are limited exceptions to the physical impact rule. As pertinent here, a plaintiff may recover for purely psychic injury "where the defendant's conduct infringed on some *legally protected interest* apart from causing the claimed distress ***." *Hammond*, 312 Or at 23 (emphasis added); *see also Phillips v. Lincoln County School District*, 161 Or App 429, 432-33, 984 P2d 947 (1999) ("[T]he term 'legally protected interest' refers to an independent basis of liability separate from the general duty to avoid foreseeable risk of harm."); *Curtis v. MRI Imaging*

---

"It cannot be true that the scope of a physician's obligation to diagnose the cause of a child's developmental delay is dependent on whether the parent asks the right question. Precisely what conversations occurred between these parents and these providers cannot be a matter of record when the case has been dismissed for failure to state a claim. What can be deduced from the Amended Complaint is that these parents presented their child to these defendants—repeatedly over a period of almost six years—to obtain diagnosis and treatment of their child's developmental delay. The very act of bringing their child to defendants constituted an inquiry."

(Internal citation omitted.)

*Services II,* 148 Or App 607, 612-18, 941 P2d 602 (1997), *aff'd on other grounds,* 327 Or 9, 956 P2d 960 (1998) (canvassing Oregon case law that carved out exceptions to the physical impact rule).

As noted, 275 Or App at 663, Kerry and Scott Tomlinson each sought noneconomic damages in the amount of $5 million. They alleged that, "[a]s a direct and foreseeable result of" defendants' negligence, they "unknowingly conceived and bore a child with a severe genetic defect" and "[h]ad defendants, and each of them, timely diagnosed Manny's DMD, [they] would not have produced another child suffering from [DMD]." They further alleged that each of them "has suffered and will continue to suffer extraordinary physical demands in caring for, transporting and assisting * * * Teddy, resulting in increased susceptibility to physical injury, and severe emotional distress[.]"

To the extent that the Tomlinsons contend that those allegations are sufficient to bring them within the scope of the physical impact rule, we disagree. The physical impact rule requires "some perceptible *physical effect* on a plaintiff." *Chouinard,* 179 Or App at 515 (emphasis added). Although the Tomlinsons must engage in physical activity "in caring for, transporting and assisting * * * Teddy," that is insufficient to establish the requisite physical effect under the rule.[11] Similarly, allegations of "increased susceptibility to physical injury" are insufficient. *Paul,* 351 Or at 599 (concluding that "plaintiffs' allegations of injury * * * are insufficient to state a claim for emotional distress damages" because "plaintiffs' alleged emotional distress is premised entirely on the *risk* of future identity theft, and not on any actual identity theft or present financial harm" (emphasis in original)).

That does not end our inquiry, however, because the Tomlinsons, by way of seeking to plead the existence

---

[11] We do not understand the Tomlinsons to have alleged—nor did they contend in the trial court or on appeal—that Kerry Tomlinson suffered the requisite physical impact by carrying and delivering Teddy. *See Simons v. Beard,* 188 Or App 370, 377, 72 P3d 96 (2003) (holding that the plaintiff had satisfied the physical impact rule because her allegations permitted the factfinder, on proof of the allegations in the operative complaint, to find that, but for the defendant's negligence, the plaintiff "would not have experienced the physical trauma of her unnecessarily protracted and ultimately futile labor").

of a cognizable "legally protected interest," further allege that they "unknowingly conceived and bore a child with a severe genetic defect" and that, "[h]ad defendants, and each of them, timely diagnosed Manny's DMD, [they] would not have produced another child suffering from [DMD]." Those allegations support the Tomlinsons' theory that defendants' negligence infringed on their important interest in controlling their "reproductive choices" and deciding "whether and when to have children." In other words, the Tomlinsons contend that defendants' negligence infringed on their interest in making informed reproductive choices. Thus, the issue here reduces to whether a parent's interest in making such choices is a "legally protected interest" that permits recovery for emotional distress damages as an exception to the physical impact rule.

In *Curtis*, we explained that a "legally protected interest" refers "to a sort of 'duty' that is distinct from *Fazzolari*-like foreseeability." 148 Or App at 618 (footnote omitted). "The identification of such a distinct source of duty is the *sine qua non* of liability for emotional distress damages unaccompanied by physical injury." *Id.*; *see also Delaney*, 180 Or App at 124 (reasoning that the plaintiff had failed to state a negligence claim because "liability for [the plaintiff's] purely psychic injury must have a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm"). Oregon courts have recognized "legally protected interests" arising from a variety of sources: (1) interests recognized by common law, *see, e.g.*, *Macca v. Gen. Telephone Co. of N.W.*, 262 Or 414, 495 P2d 1193 (1972) (private nuisance); *Hinish v. Meier & Frank Co.*, 166 Or 482, 113 P2d 438 (1941) (invasion of privacy); (2) interests arising from statutes, *see, e.g.*, *Nearing v. Weaver*, 295 Or 702, 707, 670 P2d 137 (1983) (statutory duty imposed for the benefit of individuals who had been previously identified in court order); (3) interests arising from court orders, *see McEvoy v. Helikson*, 277 Or 781, 789, 562 P2d 540 (1977) (court order established the plaintiff's legal right to the custody of his child that was infringed by attorney's negligent delivery of passport); and (4) interests arising from special relationships, *see, e.g.*, *Shin v. Sunriver Preparatory School, Inc.*, 199 Or App 352, 111 P3d 762,

*rev den*, 339 Or 406 (2005) (surrogate parental relationship between an international student and a boarding school).

Significantly, even if a plaintiff identifies a "protected interest," recovery for emotional distress damages is permitted only if the predicate legally protected interest is "'of sufficient importance as a matter of public policy to merit protections from emotional impact.'" *Lockett v. Hill*, 182 Or App 377, 380, 51 P3d 5 (2002) (quoting *Hilt v. Bernstein*, 75 Or App 502, 515, 707 P2d 88 (1985), *rev den*, 300 Or 545 (1986)). For example, where a defendant's negligence results in an underlying "economic or property loss that predictably also results in emotional distress, the invasion is not of sufficient importance to warrant an award of damages for emotional distress." *Shin*, 199 Or App at 371.[12] Conversely, "where the wrongful act constitutes an infringement of a legal right, mental suffering may be recovered for, if it is the direct, proximate and natural result of the wrongful act." *Hinish*, 166 Or at 506; *see Curtis*, 148 Or App at 622 ("[P]laintiff's psychic distress, as alleged, was the direct consequence of plaintiff's physical confinement and the concomitant violation of his psychic integrity."). In all events, whether the "invasion of a protected interest is of a sufficient quality or magnitude to warrant recovery of emotional distress damages seems, almost inevitably, to be case-specific." *Id.* at 621.

Thus, we must determine whether (1) the Tomlinsons have adequately pleaded the infringement of a distinct "legally protected interest" and (2) if they have, whether that interest is "of sufficient importance as a matter of public policy to merit protection from emotional impact." *Lockett*, 182 Or App at 380 (internal quotation marks omitted). We address each of those issues in turn.

In support of their contention that they have a legal interest in making informed reproductive choices, the Tomlinsons point to *Griswold v. Connecticut*, 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965), and *Roe v. Wade*, 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973), in which, according

---

[12] *Cf. Curtis*, 148 Or App at 622 ("[T]his is not a case in which defendants' negligence caused economic loss that, in turn, generated emotional distress.").

to the Tomlinsons, "the United States Supreme Court articulated a constitutionally protected legal right to control one's reproductive choices and to decide whether and when to have children." However, we need not resolve whether *Roe* and *Griswold*, abstractly and independently, give rise to the requisite protected interest. That is so because, under the unique circumstances of this case, the Tomlinsons have sufficiently alleged a special relationship between themselves and defendants in which defendants owed them a heightened duty of care that gave rise to a legally protected interest in making informed reproductive choices.

"Whether a relationship is special is driven by the facts." *Shin*, 199 Or App at 366. "[T]he cases establish a functional as opposed to a formal analysis in determining whether the special relationship exists; in other words, the crucial aspect of the relationship is not its name, but the roles that the parties assume in the particular interaction * * *." *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 334, 39 P3d 903, *rev den*, 344 Or 190 (2002). As we explained in *Shin*,

> "[t]he common thread among special relationships— that is, those warranting a heightened duty of care—is that 'the party who owes the duty has a *special responsibility* toward the other party':
>
> > "'"This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution."'
>
> "*Curtis*, 148 Or App at 619 (quoting *Conway* [*v. Pacific University*, 324 Or 231, 240, 924 P2d 818 (1996)] (emphasis in *Conway*))."

199 Or App at 367.

Here, the Tomlinsons have alleged such a heightened duty. To reiterate, the Tomlinsons alleged that (1) defendants had a physician-patient relationship with their son,

Manny; (2) defendants breached the standard of care in that professional relationship by failing to recognize his "developmental abnormalities as possible symptoms of [DMD]," failing to test him for and diagnose him with that genetic disorder, and failing to inform the Tomlinsons that Manny had DMD and "advise and counsel [them] at any time before Teddy was conceived that there was a fifty percent likelihood that another male child born to them would also suffer from [DMD]"; and (3) as a result, the Tomlinsons "unknowingly conceived and bore" Teddy—who has that genetic condition—and they would not have done so but for defendants' negligence.

Assuming, as we must, that those allegations, and all reasonable inferences drawn from them, are true, they are sufficient to plead the existence of a relationship of reliance between defendants and the Tomlinsons that gave rise to a duty to avoid infringing on the Tomlinsons' interest in making informed reproductive choices. In other words, the interest in making informed reproductive decisions is a "legally protected interest" under the limited circumstances alleged here—*viz.*, circumstances in which a medical provider, under the operative standard of care, is obligated to inform the biological parents that their child (*i.e.*, the provider's patient) suffers from a genetic condition and to advise them as to the reproductive consequences of such a diagnosis.

The Minnesota Supreme Court explained why, in the context of genetic testing and diagnosis, a physician's obligations extend beyond a child patient to his or her biological parents. *Molloy v. Meier*, 679 NW2d 711 (Minn 2004). In *Molloy*, the physicians failed to test Molloy's daughter for Fragile X syndrome, but nonetheless reported that the child's developmental delays were not genetic in origin.[13] Molloy then conceived and bore a son, who suffered from

---

[13] As the court explained in *Molloy*,

"[a]ccording to the expert witnesses, Fragile X syndrome, one of the leading causes of mental retardation, is often hereditary and causes developmental delays and symptoms ranging from mild learning disabilities to severe mental retardation. Fragile X is a mutation in the Fragile X Mental Retardation 1 gene in the DNA that makes up the X chromosome."

679 NW2d at 714 n 2.

Fragile X. Thereafter, Molloy learned that her daughter suffered from Fragile X and that she "carried the genetic disorder." *Id.* at 715.

In holding that "a physician's duty regarding genetic testing and diagnosis extends beyond the patient to biological parents who foreseeably may be harmed by a breach of that duty," the court noted that Molloy's daughter "suffered from a serious disorder that had a high probability of being genetically transmitted and for which a reliable and accepted test was widely available" and that the physicians "should have foreseen that parents of childbearing years might conceive another child in the absence of knowledge of the genetic disorder." *Id.* at 719. As the court explained,

> "genetic testing and diagnosis does not affect only the patient. Both the patient and her family can benefit from accurate testing and diagnosis. And conversely, both the patient and her family can be harmed by negligent testing and diagnosis. Molloy's experts indicate that a physician would have a duty to inform the parents of a child diagnosed with Fragile X disorder. The appellants admit that their practice is to inform parents in such a case. The standard of care thus acknowledges that families rely on physicians to communicate a diagnosis of the genetic disorder to the patient's family."

*Id.* (footnote omitted).

Having concluded that the Tomlinsons have alleged a legally protected interest in making reproductive decisions, we must determine whether that interest is "of sufficient importance as a matter of public policy to merit protection from emotional impact." *Lockett*, 182 Or App at 380 (internal quotation marks omitted). The Tomlinsons' reliance on *Roe* and *Griswold* bears on that issue. Although we recognize that, strictly speaking, those cases reflect a federal constitutional right to be free from governmental intrusion, they nonetheless underscore that individual interests "of personal autonomy in this area are now accorded full weight." *Berman v. Allan*, 80 NJ 421, 436, 404 A2d 8, 16 (1979) (Handler, J., concurring in part, dissenting in part); *see Keel v. Banach*, 624 So 2d 1022, 1026 (Ala 1993) (noting that some courts, including the court in *Berman*, "have said that public policy now supports, rather than militates

against, the proposition that parents should not be denied the opportunity to terminate a pregnancy").

Moreover, there can be little doubt that informing parents of their child's genetic condition so that they can make informed reproductive decisions is an obligation imposed to avoid the severe emotional distress that is the direct consequence of its infringement. In his concurrence in *Berman*—a case in which the parents alleged that, had the mother's physician informed her of the availability of amniocentesis, she would have undergone the procedure, discovered that her fetus suffered from a genetic disorder, and aborted the fetus—Justice Handler eloquently explained the nature of the infringement of that interest:

> "Without doubt, expectant parents, kept in ignorance of severe and permanent [genetic conditions] affecting their unborn child, suffer greatly when the awful truth dawns upon them with the birth of the child. Human experience has told each of us, personally or vicariously, something of this anguish. Parents of such a child experience a welter of negative feelings bewilderment, guilt, remorse and anguish as well as anger, depression and despair. When such a tragedy comes without warning these terrible emotions are bound to be felt even more deeply. 'Novelty shock' may well exacerbate the suffering. This, I believe, is the crux of the wrong done in this case. Through the failure of the doctors to advise an expectant mother, and father, of the likelihood or certainty of the birth of a [child with a genetic condition], the parents were given no opportunity to cushion the blow, mute the hurt, or prepare themselves as parents for the birth of their * * * child. Their injury is real and palpable."

80 NJ at 438-39, 404 A2d at 17-18 (Handler, J., concurring in part, dissenting in part) (citations omitted).

Those comments apply with equal force to the circumstances of this case and underscore our conclusion that the Tomlinsons have alleged the invasion of a legally protected interest that is "'of sufficient importance as a matter of public policy to merit protections from emotional impact.'" *Lockett*, 182 Or App at 380 (quoting *Hilt*, 75 Or App at 515). As Justice Handler explained, the infringement of the interest in making informed reproductive choices "may be thought

of as the deprivation of moral initiative and ethical choice" and that, "[t]o be denied the opportunity indeed, the right to apply one's own moral values in reaching that decision, is a serious, irreversible wrong." *Berman,* 80 NJ at 440, 404 A2d at 18 (Handler, J., concurring in part, dissenting in part).

Thus, the Tomlinsons' allegations pertaining to non-economic damages were legally sufficient and, as a result, their negligence claim did not reduce to one involving purely economic loss. For those reasons, the trial court erred in dismissing the Tomlinsons' negligence claim on the ground that their allegations pertaining to noneconomic damages were legally insufficient.[14]

In sum, we have concluded that the trial court erred in dismissing the Tomlinsons' negligence claim for the reasons that it did—that is, (1) the Tomlinsons' failure to allege a physician-patient relationship between defendants and themselves; (2) their failure to sufficiently allege that defendants caused their injury; and (3) the legal insufficiency of the Tomlinsons' allegations to support their request for non-economic damages. Thus, the trial court erred in dismissing the Tomlinsons' negligence claim. Accordingly, we turn to whether the trial court erred in dismissing Teddy's claim.

2. *Teddy's claim*

As previously noted, 275 Or App at 670, the trial court dismissed Teddy's claim because "there is no yardstick by which to measure his damages" and it "agree[d] with the reasoning of those courts [that] have examined such causes of action and conclude[d] that the viability of such claims is better left to policy-makers than to judges and juries." As explained below, we agree with the trial court that, under established negligence principles in Oregon, Teddy's allegations are insufficient

---

[14] As noted above, 275 Or App at 667, Legacy moved to dismiss the Tomlinsons' negligence claim on the ground that, because they could not recover noneconomic damages for emotional distress, their claim reduced to one of purely economic losses that are generally not recoverable in a negligence action. Alternatively, Legacy also moved for orders "dismissing or striking" each of the Tomlinsons' claims for emotional distress damages and their claims for economic damages. For the same reasons that the trial court erred in dismissing the Tomlinsons' negligence claim on the ground that their allegations pertaining to noneconomic damages were legally insufficient, the trial court erred in granting defendants' alternative motions.

to state a cognizable negligence claim because he has failed to plead that he suffered legally cognizable damages.[15]

To state a claim for negligence, a plaintiff must allege that he or she suffered legally cognizable damage. *See Towe*, 357 Or at 86 (noting that basic negligence principles require a plaintiff to plead and prove, among other things, that the defendant's "'breach was the cause-in-fact of some legally cognizable damage to [the] plaintiff'" (quoting *Brennen v. City of Eugene*, 285 Or 401, 405, 591 P2d 719 (1979) (brackets in *Towe*))); *Chapman v. Mayfield*, 358 Or 196, 205, 361 P3d 566 (2015) ("[C]ausation-in-fact and the occurrence of legally cognizable harm (damage) remain as elements of any *** negligence claim."). As pertinent here, Teddy—as did his parents—alleged that defendants breached the professional standard of care that they owed to Manny by failing to diagnose Manny with and inform the Tomlinsons of his genetic condition and failing "to advise and counsel the [Tomlinsons] at any time before Teddy was conceived that there was a fifty percent likelihood that another male child born to them would also suffer from [DMD]." Further, Teddy alleges that, as a foreseeable result of that breach, the Tomlinsons "unknowingly conceived and bore" Teddy, who was born with DMD. In other words, Teddy alleges that, but for defendants' negligence, he would never have been born. Thus, Teddy's alleged injury is life itself.

Teddy disagrees with that characterization. He contends that his injury is not "life itself" but rather "the impairment that accompanies the life as a result of the defendants' conduct." However, the fundamental problem with that characterization is that Teddy does not allege that defendants' negligence caused his *genetic condition*, nor could he. That condition existed upon conception. Rather the amended complaint alleges that Teddy would never have been conceived and born—that is, he would never have *been born at all*—but for defendants' negligence. *See Rich v. Foye*,

---

[15] We note that only three jurisdictions have recognized a "wrongful life" claim. *See Procanik v. Cillo*, 97 NJ 339, 478 A2d 755 (1984); *Harbeson v. Parke-Davis, Inc.*, 98 Wash 2d 460, 656 P2d 483 (1983); *Turpin v. Sortini*, 31 Cal 3d 220, 643 P2d 954 (1982). For an overview of the cases from other jurisdictions rejecting such a claim, see *Willis v. Wu*, 362 SC 146, 607 SE2d 63 (2004), and *Lininger*, 764 P2d 1202.

51 Conn Supp 11, 41, 976 A2d 819, 837 (2007) ("In this case, [the child] is alleged to have suffered a legally cognizable injury by being born impaired as opposed to not being born at all. If the purpose of awarding compensatory damages to [the child] is to put her back in the position she would have been were it not for the defendants' alleged negligence, this position would be nonexistence[.]"). Thus, contrary to Teddy's contentions, we agree with defendants that Teddy's alleged injury is "life itself."

Even if we assume for the sake of our analysis that "life" can be an injury, Teddy failed to allege legally cognizable damages.[16] In *Berman*, the court explained:

"The primary purpose of tort law is that of compensating plaintiffs for the injuries they have suffered wrongfully at the hands of others. As such, damages are ordinarily computed by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. * * * [S]uch a computation would require the trier of fact to measure the difference in value between life in an impaired condition and the utter void of nonexistence."

80 NJ at 427, 404 A2d at 11-12 (internal quotation marks and citations omitted).

As applied to Teddy's claim, a trier of fact would be required to compare the value of nonexistence—the state that Teddy would have been in but for defendants' alleged negligence—and the value of his life with DMD. Simply put, as a matter of law, that comparison is impossible to make.[17]

---

[16] *Cf. Zehr*, 318 Or at 657 (rejecting contention that "the birth of a healthy, normal child cannot be 'harm'" in the context of a "wrongful pregnancy" claim; noting that, "[f]or the purpose of withstanding a motion to dismiss, it is irrelevant that other people reasonably may consider the birth of a child to be a beneficial event" and that "[t]hat circumstance does not prevent a plaintiff from alleging the same event as a harm to that particular plaintiff, for which damages may be sought").

[17] In concluding that a child had failed to state a claim for "want of an allegation of a legally cognizable injury," the court in *Lininger* described the fundamental problem with calculating damages allegedly suffered by the child:

"We agree with the overwhelming majority of courts which have addressed the issue that a person's existence, however handicapped it may be, does not constitute a legally cognizable injury relative to non-existence. Our finding of such an injury would require first, that we value [the child's] present station in life; second, that we ascertain the value to [the child] of

Accordingly, the trial court did not err in dismissing Teddy's negligence claim.

## IV. CONCLUSION

In sum, the trial court erred in dismissing the Tomlinsons' negligence claim on the grounds that (1) the Tomlinsons failed to allege a physician-patient relationship between defendants and themselves; (2) they failed to sufficiently allege that defendants caused their injury; and (3) the allegations to support their claims for noneconomic damages were legally insufficient. However, the trial court did not err in dismissing Teddy's claim because he failed to allege legally cognizable damages. Further, as noted above, 275 Or App at 660-61, we have also rejected without written discussion defendants' cross-assignments of error concerning their motions to dismiss on statute of limitations and repose grounds. Accordingly, we reverse and remand the Tomlinsons' negligence claim—a disposition that, coupled with the trial court's "mootness" determination in this procedural posture, requires the court to consider, in the first instance, defendants' motions to strike and to make the Tomlinsons' claim more definite and certain—but otherwise affirm.

Reversed and remanded as to the Tomlinsons' negligence claim; otherwise affirmed.

---

his not having been born; and finally, that we determine that the latter value is greater than the former. Because we find it impossible to complete those steps in any rational, principled manner, we cannot find that [the child] has suffered an injury sufficient to support a claim for relief.

"With respect to the first step, one must recognize not only that [the child] will experience pain and suffering during his life, but also that he will experience benefits as well. Even if we could say with confidence that a life free of handicaps is measurably better than a life encumbered by impairments, we know of no means by which to assess the value of life without resort to such a comparison. The circumstances of [the child's] birth do not fairly lend themselves to such a comparison; he never had the opportunity to have been born completely healthy.

"Second, we cannot appraise the value of [the child's] nonexistence for purposes of comparing it with his impaired existence. The relevant question—of what value to [the child] would his non-existence have been?—is entirely too metaphysical to be understood within the confines of law, if indeed, the question has any meaning at all."

764 P2d at 1210 (footnote omitted).